NATIONAL LABOR RELATIONS BOARD *v.* AMAX COAL CO., A DIVISION OF AMAX, INC., ET AL.

No. 80–692.   Argued April 28, 1981—Decided June 29, 1981*

---

*Together with No. 80–289, *United Mine Workers of America, Local No. 1854, et al.* v. *National Labor Relations Board et al.,* also on certiorari to the same court.

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post,* p. 339.

*Harrison Combs* argued the cause for petitioners in No. 80–289. With him on the briefs were *J. Craig Kuhn, Melvin P. Stein,* and *James C. Kuhn III.*

*Harlon L. Dalton* argued the cause for the National Labor Relations Board in both cases. On the briefs were *Solicitor General McCree, Andrew J. Levander, Robert E. Allen, Norton J. Come, Linda Sher,* and *Richard B. Bader.*

*Daniel F. Gruender* argued the cause for respondent Amax Coal Co., a Division of Amax, Inc., in both cases. With him on the brief was *Raymond K. Denworth, Jr.*†

JUSTICE STEWART delivered the opinion of the Court.

This litigation concerns the relationship between two important provisions of the Labor Management Relations Act, 1947 (LMRA).[1] Section 8 (b)(1)(B) of the National Labor Relations Act, as amended by § 101 of the LMRA, 61 Stat.

---

†Briefs of *amici curiae* urging reversal were filed by *Robert J. Fenlon, Julia Penny Clark, J. Albert Woll, Laurence Gold,* and *David R. Boyd,* for the American Federation of Labor and Congress of Industrial Organizations et al.; by *Charles P. O'Connor* and *Harry A. Rissetto* for the Bituminous Coal Operators' Association, Inc.; and by *E. Calvin Golumbic* for the Board of Trustees of the United Mine Workers of America Health and Retirement Funds.

[1] 29 U. S. C. § 141 *et seq.*

141, makes it an unfair labor practice for a union "to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . . ." [2] Section 302 (c)(5) of the LMRA, 61 Stat. 157, permits employers and unions to create employer-financed trust funds for the benefit of employees, so long as employees and employers are equally represented by the trustees of the funds.[3] The question at issue is whether the employer-selected trustees of a trust fund created under § 302 (c)(5) are "representatives" of the employer "for the purposes of collective bargaining or the adjustment of grievances" within the meaning of § 8 (b)(1)(B).

## I

The Amax Coal Co. owns several deep-shaft bituminous coal mines, most of them in the Midwestern United States. The United Mine Workers of America (the union) represents Amax's employees, and, with respect to the midwestern mines, Amax is a member of the Bituminous Coal Operators Association (BCOA), a national multiemployer group that bargains with the union. Through its collective-bargaining contract with the union, Amax, along with the other members of the BCOA, agreed to contribute to the union's national pension and welfare trust funds. These funds, established under § 302 (c)(5) of the Act, provide comprehensive health and retirement benefits to coal miners and their families. In accord with § 302 (c)(5)(B), the trust funds are administered by three trustees, one selected by the union, one by the members of BOCA, and one by the other two.[4]

---

[2] 29 U. S. C. § 158 (b)(1)(B).

[3] 29 U. S. C. § 186 (c)(5).

[4] The trust agreement sets out the health and retirement benefits provided to employees and their dependents, defines the terms and the responsibilities of the trustees, describes the method of administration of the trust, and provides for periodic audits, reports, and notices. The agree-

In 1972, Amax opened the Belle Ayr Mine in Wyoming, the company's first sub-bituminous surface mine. Although Amax did not join the BCOA with respect to that mine, Amax and the union negotiated a collective-bargaining contract for Belle Ayr which resembled the BCOA national contract, and under which Amax contributed specified amounts of money to the national trust funds to benefit the employees at Belle Ayr. In January 1975, when the collectively bargained contract covering the Belle Ayr Mine ended, the union struck Belle Ayr and other western mines, attempting to compel the mine owners to establish a multiemployer bargaining unit and to agree to a new collective contract proposed by the union, under which the members of the new employer unit would contribute to the national trust funds. Amax resisted, and the union, threatened with a complaint from the National Labor Relations Board Regional Counsel for illegally attempting to coerce the employer into a multiemployer bargaining unit, soon began separate negotiations with Amax. Those negotiations came to an impasse, and the union continued its strike at the Belle Ayr Mine. Amax then filed with the Board unfair labor practice charges against the union.

The matter of pension and welfare benefits had been a major barrier to agreement between Amax and the union, and formed an important part of Amax's charges before the Board. Amax had proposed its own benefit and pension trust plan, outside the purview of § 302 (c)(5), but the union, claiming that such a plan would not be sufficiently portable to or reciprocal with the national trust funds, had rejected this proposal. Rather, the union had insisted that Amax, even as a separately bargaining employer, continue to contribute to the national trust funds for the Belle Ayr em-

---

ment also fixes the employers' contributions to the trust, requiring a specified number of cents per ton of coal produced, with the one exception that the trustees themselves retain the power to fix the rate for coal salvaged from slurry, sludge, or other refuse.

ployees. Amax, of course, as a member of BCOA, had participated in selecting the management-appointed trustee of the national trust funds, but it now wanted to appoint its own trustee for any trust fund covering the employees of the Belle Ayr Mine. Amax took the view that any management-appointed trustee of a § 302 (c)(5) trust fund was a collective-bargaining "representative" of the employer within the meaning of § 8 (b)(1)(B); therefore, since the management trustee of the national trust fund had already been selected by BCOA, Amax contended that the union's insistence that it participate in the national trust funds with regard to Belle Ayr employees constituted illegal coercion under § 8 (b)(1)(B) of the Act. Amax also charged the union with refusing to bargain in good faith in violation of § 8 (b)(3) of the Act.[5]

The National Labor Relations Board unanimously concluded that the union had acted legally in bargaining to impasse and striking to obtain Amax's participation in the national trust funds for the Belle Ayr employees.[6] The Board noted that the purpose of § 8 (b)(1)(B) was to ensure that an employer can bargain through a freely chosen representative completely faithful to his interests under the principles of agency law, while the trustee of a joint trust fund, though he may appropriately consider the recommendations of the party who appoints him, is a fiduciary owing undivided loyalty to the interest of the beneficiaries in ad-

---

[5] 29 U. S. C. § 158 (b)(3).

[6] On other claims by Amax, the Board found that the union had not bargained in bad faith in violation of § 8 (b)(3), but that the union had acted illegally in attempting to coerce Amax to join the multiemployer bargaining unit for the western mines, in failing to notify the Federal Mediation and Conciliation Service of its dispute with Amax before striking, and by insisting to impasse on certain contract proposals that would have violated § 8 (e) of the Act, 29 U. S. C. § 158 (e). The Court of Appeals affirmed all these rulings, and they are not before this Court.

ministering the trust.[7] Accordingly, the Board concluded that the union had not violated § 8 (b)(1)(B).

On cross-petitions by the parties, the Court of Appeals for the Third Circuit, relying on its earlier decision in *Associated Contractors of Essex County, Inc.* v. *Laborers International Union,* 559 F. 2d 222, 227–228, held that management-appointed trustees of a § 302 (c)(5) trust fund act as both fiduciaries of the employee-beneficiaries and as agents of the appointing employers, and, insofar as is consistent with their fiduciary obligations, are expected to administer the trusts in such a way as to advance the employer's interests. 614 F. 2d 872, 881–882. The court therefore concluded that the union had acted in violation of § 8 (b)(1)(B) in exerting its economic power to induce Amax to participate in the national trust funds with respect to employees of the Belle Ayr Mine, and reversed the Board's ruling to the contrary. We granted certiorari to consider the important question of federal labor law these cases present. 449 U. S. 1110.

## II

Although § 302 (a) of the Act [8] generally prohibits an employer from making payments to any representative of his employees, § 302 (c)(5) allows an employer to contribute to an employee benefit trust fund that satisfies certain statutory requirements. To ensure that the funds in such a trust are not used as a union "war chest," *Arroyo* v. *United States,* 359 U. S. 419, 426, the Act provides that the funds may be used only for specified benefits for employees and their dependents, and that the basis for these payments be laid out in a detailed written agreement between the union and the employer.[9] The fund must be subject to an annual audit, and

---

[7] The Board relied on its earlier resolution of this same issue in *Sheet Metal Workers' International Assn. and Edward J. Carlough (Central Florida Sheetmetal Contractors Assn., Inc.),* 234 N. L. R. B. 1238 (1978).

[8] 29 U. S. C. § 186 (a).

[9] Trust funds may pay only "for medical or hospital care, pensions on

the results of the audit must be made available to all interested persons.[10]  Furthermore, pension or annuity funds must be kept in a trust separate from other union welfare funds.[11] Finally, § 302 (c)(5)(B) requires that "employees and employers [be] equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon . . . ." [12]

Congress directed that union welfare funds be established as written formal trusts, and that the assets of the funds be "held in trust," and be administered "for the sole and exclusive benefit of the employees . . . and their families and dependents . . . ."  29 U. S. C. § 186 (c)(5).  Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.  See *Perrin* v. *United States,* 444 U. S. 37, 42–43.  Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties.  Restatement (Second) of Trusts § 170 (1) (1957); 2 A. Scott, Law of Trusts § 170 (1967).  To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against

---

retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance."  29 U. S. C. § 186 (c)(5)(A).

[10] 29 U. S. C. § 186 (c)(5)(B).

[11] 29 U. S. C. § 186 (c)(5)(C).

[12] If the trustees deadlock over a matter of trust administration, the statute further provides that the trustees may select a neutral arbiter, or "in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office . . . ."  29 U. S. C. § 186 (c)(5)(B).

a trustee dividing his loyalties must be enforced with "uncompromising rigidity." *Meinhard* v. *Salmon,* 249 N. Y. 458, 464, 164 N. E. 545, 546 (Cardozo, C. J.). A fiduciary cannot contend "that, although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one." *Woods* v. *City National Bank & Trust Co.,* 312 U. S. 262, 269.

Given this established rule against dual loyalties and Congress' use of terms long established in the courts of chancery, we must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary. See *Owen* v. *City of Independence,* 445 U. S. 622, 637. However, although § 302 (c)(5)(B) requires an equal balance between trustees appointed by the union and those appointed by the employer, nothing in the language of § 302 (c)(5) reveals any congressional intent that a trustee should or may administer a trust fund in the interest of the party that appointed him, or that an employer may direct or supervise the decisions of a trustee he has appointed.[13] And the legislative history of the

---

[13] The use of the word "representatives" in § 302 (c)(5)(B) in no way suggests that Congress did not intend to incorporate the equitable principles of fiduciary duty. The requirement that employer and employee be equally represented among the trustees of an employee benefit fund prevents any misuse of those funds by union officers who would otherwise have sole control of vast amounts of money contributed by the employer. See *Arroyo* v. *United States,* 359 U. S. 419, 425–426. The management-appointed trustee "represents" the employer only in the sense that he ensures that the union-appointed trustee does not abuse his trust with respect to the funds contributed by the employer. Nowhere in the debates over § 302 (c)(5) did any Member of either House of Congress suggest that the employer "representative" as a trustee of a benefit fund created under this statute could or should advance the interest of the employer in administering the fund. In fact, some opponents of the provision objected that the requirement of equal management-union representation imposed onerous administrative duties on the employers. *E. g.,* 93 Cong. Rec. 4749 (1947) (Sen. Murray).

LMRA confirms that § 302 (c)(5) was designed to reinforce, not to alter, the long-established duties of a trustee.

As explained by Senator Ball, one of the two sponsors of the provision, the "sole purpose" of § 302 (c)(5) is to ensure that employee benefit trust funds "are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them . . . ." 93 Cong. Rec. 4678 (1947). Senator Ball stated that "all we seek to do by [§ 302 (c)(5)] is to make sure that the employees whose labor builds this fund and are really entitled to benefits under it shall receive the benefits; that it is a trust fund, and that, if necessary, they can go into court and obtain the benefits to which they are entitled." *Id.*, at 4753; see H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 66–67 (1947), 1 NLRB, Legislative History of the Labor-Management Relations Act, 1947, p. 570 (1948) (Leg. Hist. LMRA). The debates on § 302 (c)(5) further reveal Congress' intent to cast employee benefit plans in traditional trust form precisely because fiduciary standards long established in equity would best protect employee beneficiaries. For example, one opponent of the bill suggested that § 305 (c)(5) was unnecessary because even without that provision, the "officials who administer [the fund] thereby become trustees, subject to all of the common law and State safeguards against misuse of funds by trustees." 93 Cong. Rec. 4751 (1947) (Sen. Morse). Senator Taft, the primary author of the entire Act, answered that many existing funds were not created expressly as trusts, and that § 302 (c)(5)'s requirement that each fund be an express and enforceable trust would ensure that the future operations of all such funds would be subject to supervision by a court of chancery. 93 Cong. Rec. 4753 (1947). See also *id.*, at 4678 (Sen. Ball); *id.*, at 3564–3565 (Rep. Case, author of House bill on which § 302 (c)(5) was patterned). In sum, the duty of the management-appointed trustee of an employee benefit fund under

§ 302 (c)(5) is directly antithetical to that of an agent of the appointing party.[14]

Whatever may have remained implicit in Congress' view of the employee benefit fund trustee under the Act became explicit when Congress passed the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829. ERISA essentially codified the strict fiduciary standards that a § 302 (c)(5) trustee must meet. See 29 U. S. C. §§ 1002 (1) and (2); H. R. Conf. Rep. No. 93–1280, pp. 296, 307 (1974). Section 404 (a)(1) of ERISA requires a trustee to "discharge his duties . . . solely in the interest of the participants and beneficiaries . . . ." 29 U. S. C. § 1104 (a)(1).[15] Section

---

[14] The legislative history of § 302 (c)(5) also bears directly on the actual question underlying the statutory issue in this litigation: whether Congress intended to prohibit union demands for employer participation in established multiemployer trust funds. One of the events that greatly influenced the legislative efforts culminating in the Act was the demand of John L. Lewis, then head of the United Mine Workers, that all mine owners contribute 10 cents per ton of coal produced into a central welfare fund established by the union itself. *United States* v. *Ryan,* 350 U. S. 299, 304–305; S. Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 52 (1947), 1 Leg. Hist. LMRA, at 458. The debates and Reports reveal that despite considerable congressional opposition to Lewis' demands, *ibid.;* 93 Cong. Rec. 3423, 3516–3517, 3564–3565 (1947) (remarks of Reps. Hartley, Fisher, and Case); *id.,* at 4678, 4746–4748 (Sens. Byrd and Taft), Congress specifically rejected proposals that would have rendered those demands illegal either by providing that union proposals concerning pension welfare benefits were not mandatory subjects of bargaining, or by prohibiting all such funds even indirectly established or managed by a union. See H. R. 3020, 80th Cong., 1st Sess., §§ 2 (11), 8 (a)(2)(C)(ii) (1947), 1 Leg. Hist. LMRA, at 39–40, 51; H. R. Rep. No. 245, 80th Cong., 1st Sess., 14–17 (1947), 2 Leg. Hist. LMRA, at 305–308.

[15] A "participant" is "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan . . . , or whose beneficiaries may be eligible to receive any such benefit." 29 U. S. C. § 1002 (7). A "beneficiary" is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U. S. C. § 1002 (8).

406 (b)(2) declares that a trustee may not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries." 29 U. S. C. § 1106 (b)(2). Section 405 (a) imposes on each trustee an affirmative duty to prevent every other trustee of the same fund from breaching fiduciary duties, including the duty to act solely on behalf of the beneficiaries. 29 U. S. C. § 1105 (a).

Moreover, the fiduciary requirements of ERISA specifically insulate the trust from the employer's interest. Except in circumstances involving excess contributions or termination of the trust, "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." § 403 (c)(1), 29 U. S. C. § 1103 (c) (1). Finally, § 406 (a)(1)(E) prohibits any transaction between the trust and a "party in interest," including an employer, and § 407 carefully limits the amount and types of employer-owned property and securities that the trustees may obtain for the trust. 29 U. S. C. §§ 1106 (a)(1)(E), 1107.[16] In sum, ERISA vests the "exclusive authority and discretion to manage and control the assets of the plan" in the trustees alone, and not the employer or the union. 29 U. S. C. § 1103 (a).

The legislative history of ERISA confirms that Congress intended in particular to prevent trustees "from engaging in actions where there would be a conflict of interest with the

---

[16] Although § 408 (c)(3) of ERISA permits a trustee of an employee benefit fund to serve as an agent or representative of the union or employer, that provision in no way limits the duty of such a person to follow the law's fiduciary standards while he is performing his responsibilities as trustee.

fund, such as representing any party dealing with the fund." S. Rep. No. 93–383, pp. 31, 32 (1973). In short, the fiduciary provisions of ERISA were designed to prevent a trustee "from being put into a position where he has dual loyalties, and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries." H. R. Conf. Rep. No. 93–1280, *supra*, at 309.[17]

## III

The language and legislative history of § 302 (c)(5) and ERISA therefore demonstrate that an employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party that appointed him. Thus, the statutes defining the duties of a management-appointed trustee make it virtually self-evident that welfare fund trustees are not "representatives for the purposes of collective bargaining or the adjustment of grievances" within the meaning of § 8 (b)(1)(B). But close examination of the latter provision makes it even clearer that it does not limit the freedom of a union to try to induce an employer to select a particular § 302 (c)(5) trustee.[18]

Congress enacted § 8 (b)(1)(B) largely to prevent unions

---

[17] In 1980, Congress amended ERISA to impose new responsibilities upon the trustees of multiemployer trust funds, passing the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1209, which reaffirmed that the trustees must act solely in the interest of the trust beneficiaries, see H. R. Rep. No. 96–869, pt. 1, p. 67 (1980).

[18] Neither statutory provision refers to the other, and though the same congressional Committees considered the issues of employee benefit trust funds and multiemployer bargaining, the legislative history nowhere suggests that Congress intended that the restrictions on union activity created by § 8 (b)(1)(B) were relevant to the selection of § 302 (c)(5) trustees. Indeed, though faced with a United Mine Workers demand that owners contribute a fixed percentage of their coal receipts to a multiemployer trust fund created by the union, Congress rejected several proposals that would have denied the union the power to make such demands. See n. 14, *supra*.

from forcing employers to join multiemployer bargaining units, or to dictate the identity of those who would represent employers in collective-bargaining negotiations or the settlement of employee grievances. See *American Broadcasting Cos.* v. *Writers Guild,* 437 U. S. 411, 422–423, 429–431, 435–436; *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790, 803; S. Rep. No. 105, 80th Cong., 1st Sess., pt. 1, p. 21, (1947), 1 Leg. Hist. LMRA, at 427; 93 Cong. Rec. 4143 (1947) (Sen. Ellender).[19] The legislative history reveals the concern of some Senators that if unions could strike or bargain to impasse to compel employers to join industrywide bargaining units, the large unions might exercise monopoly power over wages or call strikes threatening large portions of the national economy. S. Rep. No. 105, pt. 1, *supra,* at 51, 1 Leg. Hist. LMRA, at 457; 93 Cong. Rec. 4582–4588 (1947) (Sen. Taft). However, the power of a union to strike or bargain to impasse to induce an employer to contribute to a multiemployer trust fund does not pose the danger Congress sought to prevent. Congress treated the issues of multiemployer bargaining units and multiemployer trust funds quite distinctly. It is permissible under the law, and may be in the interest of the public, for an employer to bargain separately with a union, independently of any industrywide employer association, while the union exerts economic pressure to obtain protection for the employees through the medium of a multiemployer benefit fund.

Moreover, union pressure to force an employer to contribute to an established employee trust fund does not amount to dictating to an employer who shall represent him in collective bargaining and the adjustment of grievances, because the trustees of a § 302 (c)(5) trust fund simply do not, as

---

[19] Another concern of § 8 (b)(1)(B), of no relevance here, was to prevent a union from striking to force an employer to fire a supervisor who, in the union's view, was too stern in his treatment of employees. 93 Cong. Rec. 3837–3838 (1947) (Sen. Taft).

such, engage in these activities. The term "collective bargaining" in § 8 (b)(1)(B) of the Act is defined by § 8 (d):

> "[T]he performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . ." 29 U. S. C. § 158 (d).

Under this definition, the collective-bargaining representatives of an employer and a union attempt to reach an agreement by negotiation, and, failing agreement, are free to settle their differences by resort to such economic weapons as strikes and lockouts, without any compulsion to reach agreement. See *Carbon Fuel Co.* v. *Mine Workers,* 444 U. S. 212, 219; *NLRB* v. *Insurance Agents,* 361 U. S. 477, 495.

The atmosphere in which employee benefit trust fund fiduciaries must operate, as mandated by § 302 (c)(5) and ERISA, is wholly inconsistent with this process of compromise and economic pressure. The management-appointed and union-appointed trustees do not bargain with each other to set the terms of the employer-employee contract; they can neither require employer contributions not required by the original collectively bargained contract, nor compromise the claims of the union or the employer with regard to the latter's contributions. Rather, the trustees operate under a detailed written agreement, 29 U. S. C. § 186 (c)(5)(B), which is itself the product of bargaining between the representatives of the employees and those of the employer.[20] In-

---

[20] The sole and minor exception under the agreement governing the national trust funds in this litigation is the authority of the trustees to fix

deed, the trustees have an obligation to *enforce* the terms of the collective-bargaining agreement regarding employee fund contributions against the employer "for the sole benefit of the beneficiaries of the fund." *United States* v. *Carter,* 353 U. S. 210, 220. Finally, disputes between benefit fund trustees over the administration of the trust cannot, as can disputes between parties in collective bargaining, lead to strikes, lockouts, or other exercises of economic power. Rather, whereas Congress has expressly rejected compulsory arbitration as a means of resolving collective-bargaining disputes, § 302 (c)(5) explicitly provides for the compulsory resolution of any deadlocks among welfare fund trustees by a neutral umpire. Compare 29 U. S. C. § 158 (d) with 29 U. S. C. § 186 (c)(5); see. n. 12, *supra.*[21]

Like collective bargaining, the adjustment of grievances concerns the relationship between employer and employee. See 29 U. S. C. § 159 (a). The trustees' concern, however,

---

the number of cents per ton of salvage coal produced which a mine operator must contribute to the funds. See n. 4, *supra.*

[21] If the administration of § 302 (c)(5) trust funds were "collective bargaining" within the meaning of federal labor law, as it would be under the Court of Appeals' view, the NLRB would have to review the discretionary actions of the trustees according to the statutory duty of good-faith bargaining. 29 U. S. C. §§ 158 (a)(5), (b)(3), (d). The Board would thereby be thrust "into a new area of regulation which Congress [has] not committed to it," *NLRB* v. *Insurance Agents,* 361 U. S. 477, 499. Moreover, under the Court of Appeals' view, a trustee would be subject to simultaneous regulation by the Board, the Secretary of Labor, and the courts, and might be torn between conflicting duties imposed by the National Labor Relations Act and ERISA. For example, ERISA requires a trustee to prevent any other trustee from breaching his fiduciary responsibilities to the trust beneficiaries. 29 U. S. C. §§ 1105 (a)(3), (b)(1)(A). On the other hand, § 8 (b)(1)(B) bars a union representative from interfering with the employer's collective-bargaining agent's performance of his duties in accordance with the employer's instructions. *American Broadcasting Cos.* v. *Writers Guild,* 437 U. S. 411, 436. Therefore, if trust fund administration is collective bargaining, a trustee could be charged with an unfair labor practice by carrying out his duties under ERISA.

is the relationship between the beneficiaries and the fund. The only "grievances" it may adjust are those concerning the eligibility of employees or their dependents for participation in the benefits of the fund. See *Chemical Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 164–171. And whereas Congress has adopted the principle of voluntary settlement, free of governmental compulsion, in the adjustment of employee grievances against the employer, § 203 (d) of the Act, 29 U. S. C. § 173 (d), a trustee deadlock over eligibility matters, like any other deadlock, must be submitted to the compulsory resolution procedure established by § 302 (c)(5).

"Both the language and the legislative history of § 8 (b) (1)(B) reflect a clearly focused congressional concern with the protection of employers in the selection of representatives to engage in two particular and explicitly stated activities, namely collective bargaining and the adjustment of grievances." *Florida Power & Light Co.* v. *Electrical Workers*, 417 U. S., at 803. The duties of an employer-appointed trustee of an employee benefit trust fund, under § 302 (c)(5) of the Act, under principles long ago developed in the courts of chancery, and under the specific provisions of ERISA, are totally alien to both of these activities. The Court of Appeals, therefore, was mistaken in believing that the conduct of the union in this case violated the provisions of § 8 (b)(1)(B).[22]

---

[22] The view of the Court of Appeals that the union could not seek to compel the employer to join an established employee trust fund conflicts with recent legislation concerning multiemployer pension plans. In this litigation, Amax claimed complete power under § 8 (b)(1)(B), unaffected by union economic pressure, to select the sole trustee, or all the trustees, of the trust fund benefiting the Belle Ayr Mine employees. Since, by definition, it is impossible for every employer participating in a multiemployer trust fund to exercise such power, the Court of Appeals' decision upholding Amax's claim would effectively preclude a union from resorting to economic pressure to cause an employer to participate in a multiemployer trust fund. Congress amended ERISA in 1980 to strengthen the funding requirements and enhance the financial stability of

For the reasons stated, the judgment of the Court of Appeals is reversed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

The key to this case, in my judgment, is the distinction between the process by which a person is appointed to office and the manner in which he performs that office after he has been appointed. Congress has provided that labor and management shall each appoint the same number of representatives to serve as trustees of jointly administered employee pension and welfare funds.[1] Giving each side of the bar-

---

multiemployer pension plans. In these amendments, Congress sought to foster "the maintenance and growth of multiemployer pension plans . . . [and] to provide reasonable protection for the interests of the participants and beneficiaries of financially distressed multiemployer pension plans." §§ 3 (c)(2) and (c)(3) of the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1209–1210. Section 3(a)(4)(A) of the 1980 Act states that "withdrawals of contributing employers from a multiemployer pension . . . adversely [affect] the plan, its participants and beneficiaries, and labor-management relations. . . ." 94 Stat. 1209. The Court of Appeals' decision therefore runs afoul of express congressional policy favoring multiemployer trusts.

[1] Section 302 (a) of the Labor Management Relations Act, 1947, generally prohibits payments by employers to representatives of their employees. 29 U. S. C. § 186 (a). Section 302 (c)(5) creates an exception to this general prohibition for payments to certain trust funds established for the sole benefit of employees. 29 U. S. C. § 186 (c)(5). The statute contains detailed requirements that trust funds must satisfy to qualify for the exception:

"The provisions of this section shall not be applicable . . . with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents) : *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families

gaining table exclusive control of the appointment of half of the trustees does not compromise in any way the fiduciary obligations of the trustees after they assume office. Conversely, the imposition of fiduciary responsibilities on the trustees after they have been appointed surely does not lend any support to the Court's quixotic notion that a union may interfere—by a strike if necessary—with management's selection of its representatives.

Three quite different theories might provide a basis for deciding this case in favor of the United Mine Workers (the union). First, the Court might conclude that the union was merely trying to induce Amax to agree to contribute to the national multiemployer trust funds and that it had no interest in the identity of the management trustees of those

and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the' administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the District Court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities . . . ." 29 U. S. C. § 186 (c) (5).

funds. Second, the Court might conclude that because Amax, as a member of the Bituminous Coal Operators Association, actually participated in the selection of the management trustees of the union's national trust funds, there is no basis for its claim that the union was interfering with that prerogative of management. Third, the Court might conclude that it is permissible for a union to restrain or to coerce an employer in the selection of its representatives for the purpose of administering joint employee pension and welfare funds.

If the Court relied on either of the first two rationales, or if its opinion could be read as resting on a blend of all three, this case would not be particularly significant. I believe, however, that the Court's opinion will be read as holding that it is not an unfair labor practice for a union to attempt to exercise an economic veto over an employer's selection of the management trustees of a jointly administered employee benefit fund.[2] In my opinion, that holding is foreclosed by rather plain statutory language and is flagrantly at odds with the intent of Congress.

I

The equal representation requirement of § 302 (c)(5) is one of a number of restrictions employed by Congress to prevent the mismanagement or misuse of employee benefit funds by union officials. See, e. g., Arroyo v. United States, 359 U. S. 419, 426; Associated Contractors, Inc. v. Laborers International Union, 559 F. 2d 222, 226 (CA3 1977).[3] Equal

---

[2] The Court states that "close examination of the latter provision [§ 8(b)(1)(B)] makes it even clearer that it does not limit the freedom of a union to try to induce an employer to select a particular § 302 (c)(5) trustee." Ante, at 334.

[3] In addition to containing numerous specific references to John L. Lewis and the United Mine Workers central fund, see, e. g., S. Rep. No. 105, 80th Cong., 1st Sess., 52 (1947), reprinted in 1 Legislative History of the Labor Management Relations Act, 1947, 458 (Leg. Hist. LMRA); 93 Cong. Rec. 3564–3569, A1910 (1947); id., at 4678, 4746–4748, 5015; the legislative history is replete with general expressions of concern about union misman-

representation was required, not to satisfy employer demands for a voice in benefit fund administration,[4] but to insure that money paid for the welfare of employees actually was used for that purpose. As Senator Taft explained:

"Certainly unless we impose some restrictions we shall find that the welfare fund will become merely a war chest for the particular union, and that the employees for whose benefit it is supposed to be established, for certain definite welfare purposes, will have no legal rights and will not receive the kind of benefits to which they are entitled after such deductions from their wages.

.        .        .        .        .

"This amendment is, in effect, a provision to prevent the abuse of the right to establish such funds by collective bargaining, pending further study of the whole problem. Otherwise I think we shall find that the welfare fund will become a racket. In many unions it is very easy for it to become a racket." 93 Cong. Rec. 4747 (1947).

The requirement of equal labor-management representation is a central factor in the congressional formula to prevent

---

agement and misuse of employee benefit funds. See, e. g., S. Rep. No. 105, 80th Cong., 1st Sess., 52 (1947), 1 Leg. Hist. LMRA 458; 93 Cong. Rec. 3569 (1947); id., at 4678, 4746–4747, 4752–4753. The equal representation requirement was a direct response to these concerns. As Senator Ball explained:

"In other words, when the union has complete control of this fund, when there is no detailed provision in the agreement creating the fund respecting the benefits which are to go to employees, the union and its leadership will always come first in the administration of the fund, and the benefits to which the employees supposedly are entitled will come second." Id., at 4753.

See also S. Rep. No. 105, 80th Cong., 1st Sess., 52 (1947), 1 Leg. Hist. LMRA 458; 93 Cong. Rec. 3564 (1947); id., at 4678, 4746.

[4] Indeed, opponents of the bill that became § 302 argued that many employers wanted absolutely nothing to do with the administration of employee benefit funds. See, e. g., id., at 4749, 4751–4752.

such abuse. See, *e. g., Associated Contractors, Inc., supra,* at 227; *Toensing* v. *Brown,* 374 F. Supp. 191, 195 (ND Cal. 1974), aff'd, 528 F. 2d 69 (CA9 1975).

Although the Court repeatedly uses the word "trustee" to identify the persons who administer pension and welfare funds established in compliance with § 302 (c)(5), Congress used the word "representative." See 29 U. S. C. § 186 (c) (5). Congress' use of this term does not, of course, qualify the fiduciary responsibilities of those persons.[5] It is nevertheless important for two reasons. First, it is a reminder that one of the means selected by Congress for insuring neutrality in the administration of a trust fund was to give each ·side of the bargaining table an equal voice in the selection of trustees. Second, it is a recognition of the fact that the administration of a trust fund often gives rise to questions over which representatives of management and representatives of labor may have legitimate differences of opinion that are entirely consistent with their fiduciary duties.

The Court's extended discussion of the fiduciary responsibilities of employee benefit fund trustees has, in my judgment, little ·bearing on the question presented in this case. It is undisputed that such trustees are fiduciaries whose primary loyalty must be to the beneficiaries of the funds. The question with which we are confronted here is whether this fiduciary duty is necessarily wholly inconsistent with "representative" status. The Court answers this question in the affirmative by citing traditional principles of trust law and their federal statutory counterparts. This approach leads the Court into error because it ignores the purpose under-

---

[5] However, the fact that Congress used the term "representative" rather than "trustee" is significant in light of the Court's reliance on the principle that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Ante,* at 329.

lying § 302 (c)(5) and the carefully designed means chosen by Congress to achieve that purpose.

The trustees of employee benefit funds often exercise broad discretion on policy matters with respect to which management and labor representatives may reasonably have different views. Besides describing the trustees as "representatives," Congress expressly recognized in § 302 (c)(5) that such differences would arise, for it provided a procedure to resolve such differences in the event of a deadlock between "the employer and employee groups." Nothing in the statute or the legislative history suggests that differences along labor-management lines are in any way inconsistent with the trustees' fiduciary duty to the trust beneficiaries. Indeed, it is precisely because management and the union can have legitimate differences with respect to matters of trust administration that the equal representation requirement serves as an effective safeguard. Although the Court seems to ignore this principle in its decision today, it has been recognized in the past by other federal courts [6] and by the commentators.[7]

---

[6] In *Associated Contractors, Inc.* v. *Laborers International Union,* 559 F. 2d 222 (CA3 1977), the decision on which the Court of Appeals relied in this case, the court recognized that the inevitable conflict between the views of labor and the views of management with respect to the administration of employee benefit funds was an essential feature of the statutory protection designed by Congress:

"The starting point for analysis must be the candid recognition that the relationship between employer and employee trustees of an employee benefit trust fund is quasi-adversarial in nature. Naturally, the trustees of such a trust fund function as fiduciaries for the funds' beneficiaries but they also serve as representatives of the parties who appoint them. Insofar as it is consistent with their fiduciary obligations, employer trustees are expected to advance the interests of the employer while employee trustees are expected to further the concerns of the union in the ongoing collective bargaining process between them. . . . The trustees' efforts to improve the position of the parties they represent are completely legitimate—indeed, they are essential to the operation of section 302 (c)(5).

The trust agreement at issue in this case allows ample room for such labor-management differences. For example, it authorizes the trustees to determine how much money each operator shall contribute to the fund on account of the production of salvaged coal. See App. 98k–98*l*. That kind of detail could be covered in the basic collective-bargaining agreement or left to the trustees for resolution in the light of changing circumstances. When the trustees resolve such an issue, one surely could not charge a management representative with a breach of trust merely for favoring a lower rate than the union representatives suggest.

The Court states that the trustees may never "compromise the claims of the union or the employer with regard to the

---

Congress envisioned the conflict of views of employer and employee as a distilling process which would provide safeguards against trust fund corruption." *Id.,* at 227–228 (citations omitted).

See also *Ader* v. *Hughes,* 570 F. 2d 303, 308 (CA10 1978); *Lamb* v. *Carey,* 162 U. S. App. D. C. 247, 251, 498 F. 2d 789, 793 (1974), cert. denied *sub nom. Carey* v. *Davis,* 419 U. S. 869; *Toensing* v. *Brown,* 374 F. Supp. 191, 195 (ND Cal. 1974), aff'd, 528 F. 2d 69 (CA9 1975).

[7] One commentator described the statutory scheme, as follows:

"The governing trust agreement separately entered into by the parties to the collective bargaining agreement may specify general categories of benefits, but it normally delegates to the trustees broad discretion to determine specific benefit levels and eligibility requirements, to modify the benefit plan, and to administer the plan.

"Exercise of this discretionary power may involve important questions of policy or judgment on which union and employer trustees may well differ. This potential divergence of interests was the underlying reason for the statutory requirement of equal representation. Employer representatives were intended to act as a check on the untrammeled discretion of the union. The possibility of adverse interests leading to dispute is recognized by the statutory provision for breaking deadlocks through appointment of an impartial umpire." Goetz, Developing Federal Labor Law of Welfare and Pension Plans, 55 Cornell L. Rev. 911, 922–923 (1970) (footnote omitted).

See also Goetz, Employee Benefit Trusts Under Section 302 of Labor Management Relations Act, 59 Nw. U. L. Rev. 719, 748 (1965).

latter's contributions" to the fund. *Ante,* at 336. But what if one contributor to a multiemployer fund is unable to pay its bills currently? Do trustees have no power to enter into temporary arrangements or compromises?[8] In making decisions regarding the investment of the assets of the fund, legitimate differences among faithful trustees certainly may arise. Conceivably, management representatives may favor conservative investment policies that are best designed to guarantee the long-range solvency of the fund while labor representatives may favor investments with higher yields that will support a demand for more liberal benefits at the next bargaining session. No written trust agreement can entirely eliminate the need for discretionary decisions by trustees nor make it impermissible for the trustees to give consideration to the interests that they represent when confronting day-to-day administrative problems.

Some of the issues the trustees must resolve in processing applications for benefits are almost identical to those that arise in grievance proceedings. Rights to pension benefits and to seniority are measured, in part, by the employee's length of service. Either in the adjustment of a grievance over seniority or in the trustees' approval or disapproval of a claim for retirement benefits, it may be necessary to resolve a dispute over how to measure the period of employment. Bargaining units tend to develop an unwritten "law of the shop" to resolve such recurring minor disputes; it seems to me equally permissible for trustees to develop a similar common law of their own and for representatives of the two sides of the bargaining table to reflect different points of view as that law develops. The guarantee of impartiality in making

---

[8] The trust agreement in this record suggests the contrary:

"The Trustees shall take such action as they deem appropriate to collect any such delinquencies, and shall advise the International Union and the appropriate Districts and Locals of the Union, on at least a monthly basis, of such delinquencies, as long as such delinquencies continue." App. 98p.

decisions of this kind is not a total divorce of every trustee from the interests that he represents; rather, neutrality is guaranteed by having an equal number of "representatives" of the two conflicting interests make the decisions, subject always to their basic obligation as fiduciaries. That this is the scheme of the statute is perfectly clear from its terms.[9]

It is equally clear that this scheme will be compromised if the employer's selection of his representatives is now to be a subject of collective bargaining. The danger to the legislative scheme is not mitigated by the fact that the employer need not agree with the union's demand that a particular person be named a management trustee. The employer may consider it less costly to give the union a veto over the selection of the management trustees than to grant a wage increase.[10] Any bargaining over the identity of a trustee inevi-

---

[9] As noted above, the word "trustee" does not appear in § 302 (c) of the LMRA. That section does require that "employees and employers are equally represented in the administration of such fund, together with such neutral persons as the representatives of the employers and the representatives of the employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute . . . ." 29 U. S. C. § 186 (c)(5)(B). It seems to me that this statutory language is quite inconsistent with the Court's view that the trustees are essentially fungible once they have been appointed.

[10] Because the equal representation requirement primarily benefits the fund's beneficiaries rather than the employer, it is unlikely that an employer would be willing to risk a strike or other economic pressure on the part of the union in order to preserve its right to choose its own representatives to the employee benefit fund. As the legislative history suggests, see n. 4, *supra,* many employers probably view the equal representation requirement as an unwelcome burden at best, rather than as an essential right worth defending at the risk of extended labor strife. Cf. Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv. L. Rev. 274, 290, 314 (1948) ("The provisions dealing with employer contributions to union trust funds set the employer up as watchdog, although it has no interest in the fund").

tably will destroy the precise balance that Congress intended by directing that each side shall select its own representatives. As JUSTICE BLACKMUN aptly stated while a member of the Court of Appeals for the Eighth Circuit:

> "[T]o permit the union in any degree to participate in the choice of employer representatives does violence to the statutory standard of equal representation." *Blassie* v. *Kroger Co.,* 345 F. 2d 58, 72 (1965).[11]

In my opinion, the Court today "does violence to the statutory standard" because it misapprehends the safeguard established by Congress in § 302 (c)(5), and instead applies to this case principles of trust law and statutory provisions that have little, if any, relevance to the precise question presented.

## II

In addition to arguing that there is an inherent inconsistency between the duties of a "trustee" and the duties of a "representative"—and therefore that the trustees of an employee benefit fund cannot be representatives even though they are so named by Congress—the Court suggests that in any event these representatives are not selected "for the purposes of collective bargaining or the adjustment of grievances" within the meaning of § 8 (b)(1)(B), 29 U. S. C. § 158 (b)(1)(B).[12] The Court seems to read this provision as a narrow, precisely defined prohibition against interference with the selection of a relatively small number of representatives

---

[11] See also *Associated Contractors, Inc.,* 559 F. 2d, at 227; *Quad City Builders Assn.* v. *Tri City Bricklayers Union,* 431 F. 2d 999, 1003 (CA8 1970).

[12] Section 8 (b) of the National Labor Relations Act provides, in pertinent part:

"It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances . . ." 29 U. S. C. § 158 (b)(1)(B).

whose primary function is to represent the employer in collective-bargaining negotiations or in the adjustment of grievances. Once again, the Court overlooks the distinction between interfering with the selection process and interfering with the performance of a supervisor's duties after he has been selected. I believe the Court's narrow construction was not intended by Congress, and that the statute prohibits union interference with management's selection of all personnel who have any, however minor, collective-bargaining or grievance-adjustment responsibilities. When § 8 (b)(1)(B) is read in light of its purpose and legislative history, it is plain that the prohibition applies to the selection of the employer's representatives in the administration of joint benefit funds.

The Court's narrow view of § 8 (b)(1)(B) has its source in *Florida Power & Light Co.* v. *Electrical Workers,* 417 U. S. 790—a case that did not involve any direct interference with the employer's selection of supervisors. In that case, we held that "a union's discipline of one of its members who is a supervisory employee can constitute a violation of § 8 (b)(1) (B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer." *Id.,* at 804–805. Thus, to make out a violation of the statute in such a case, it is not enough to show that the union disciplined a supervisor who had some collective-bargaining or grievance-adjustment responsibilities; the discipline itself must relate directly to the supervisor's performance of those duties. See also *American Broadcasting Cos.* v. *Writers Guild,* 437 U. S. 411, 429–430. This direct relationship is an appropriate element of a § 8 (b) (1)(B) violation in a case involving union discipline of a supervisor because such discipline only indirectly affects the "selection" of management representatives, the primary focus of the statute. However, whenever the union conduct has a direct impact on the employer's selection of a representative,

it is not necessary that that conduct bear a direct relationship to the representative's collective-bargaining or grievance-adjustment duties; it is sufficient that the union attempt to coerce or to restrain management in the selection of a representative who will have such duties, even if they will constitute only a small portion of his overall responsibilities.

The legislative history of § 8 (b)(1)(B) supports a broad reading of the prohibition against union conduct aimed directly at the actual selection of employer representatives. Section 8 (b)(1)(B) was intended to protect the basic management prerogative of selecting foremen and more senior executives who exercise supervisory authority over employees and represent the company in its relationship with employees and their collective-bargaining agent. The sparse comments on the provision in the legislative history persuade me that Congress intended the description of "representatives for the purposes of collective bargaining or the adjustment of grievances" to refer to a category of employer representatives whose selection was exclusively a matter of management prerogative.

Thus, Senator Taft explained the provision by using the example of an unpopular foreman who may well have had no specific responsibility for either collective bargaining or adjusting grievances. He said:

> "This unfair labor practice referred to is not perhaps of tremendous importance, but employees cannot say to their employer, 'We do not like Mr. X, we will not meet Mr. X. You have to send us Mr. Y.' That has been done. It would prevent their saying to the employer, 'You have to fire Foreman Jones. We do not like Foreman Jones, and therefore you have to fire him, or we will not go to work.'" 93 Cong. Rec. 3837 (1947).

A few days later, in a brief discussion of provisions in the bill intended to deal with "strikes invading the prerogatives

of management," Senator Ellender identified § 8 (b)(1) as covering the coercion of an employer "either in the selection of his bargaining representative or in the selection of a personnel director or foreman, or other supervisory official." 93 Cong. Rec. 4143 (1947). His description of the provision surely supports a broad reading of the prohibition against strikes invading the prerogatives of management, rather than a narrowly restricted reference to a precisely defined category of representatives principally involved in collective bargaining and grievance adjustment.[13]

Therefore, to sustain its position in this case, it seems to me that the Court must establish that no part of the duties of an employee benefit fund trustee involve collective-bargaining or grievance-adjustment activities. But even if one gives the narrowest literal reading to the term "collective bargaining," it is clear that employee benefit trust agreements generally, and the trust agreement involved in this case in particular, authorize the two groups of representatives to engage in collective-bargaining activity. The statute broadly defines collective bargaining to encompass any conference with respect to "the negotiation of an agreement, or any question

---

[13] Senator Ellender's full statement on this point reads as follows:

"I shall now deal briefly with strikes invading the prerogatives of management.

"The bill prevents a union from dictating to an employer on the question of bargaining with union representatives through an employer association. The bill, in subsection 8 (b)(1) on page 14, makes it an unfair labor practice for a union to attempt to coerce an employer either in the selection of his bargaining representative or in the selection of a personnel director or foreman, or other supervisory official. Senators who heard me discuss the issue early in the afternoon will recall that quite a few unions forced employers to change foremen. They have been taking it upon themselves to say that management should not appoint any representative who is too strict with the membership of the union. This amendment seeks to prescribe a remedy in order to prevent such interferences." 93 Cong. Rec. 4143 (1947).

arising thereunder." 29 U. S. C. § 158 (d).[14] Such negotiation is manifestly a part of a trustee's duties.[15]

In addition to the provision delegating to the trustees the power to fix the contribution rate for salvaged coal production, see *supra,* at 345, the agreement in this case provides that the trustee representing the union and the trustee representing the employers shall select the neutral trustee.[16] When the trustee representing the union and the trustee representing the employers select the neutral trustee, they surely are resolving a question arising under the agreement. It is there-

---

[14] In pertinent part, § 8 (d) of the National Labor Relations Act reads:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . ." 29 U. S. C. § 158 (d).

[15] The wall between collective-bargaining activities and the duties of welfare fund trustees on which the Court's opinion is based simply does not exist. As one commentator has observed:

"[T]he subjects about which the trustees confer are within the scope of mandatory collective bargaining under the Act.

.     .     .     .     .

"Despite the unusual setting, the deliberations of trustees of these funds may be looked upon as an extension of the collective bargaining process within contractual and statutory limits." Goetz, *supra* n. 7, 55 Cornell L. Rev., at 922, 923.

See also *Toensing* v. *Brown,* 374 F. Supp., at 195–196.

[16] The agreement provides:

*"Section (e)* Responsibilities and Duties of Trustees

"(1) Each Trust shall be administered by a Board of three Trustees, one of whom shall be appointed by the Employers; one of whom shall be appointed by the Union; and one of whom shall be a neutral party, *selected by the other two."* App. 98n (emphasis added).

fore perfectly clear that they are literally engaged in collective bargaining as that term is defined in the Act. Indeed, whenever they confer about various questions that arise in connection with the administration of the trust agreement, they inevitably are engaged in that activity as defined in the statute. The fact that differences between labor and management trustees in the administration of the fund are to be resolved through the neutral umpire procedure established in § 302 (c)(5), rather than through strikes or lockouts, does not in any way change the character of the trustees' function.

In this case, there is no need to decide when, or indeed if ever, the refusal of one trustee to confer with another might constitute a refusal to bargain in good faith and therefore an unfair labor practice. It may well be true that the fiduciary obligations imposed by the Employee Retirement Income Security Act, 29 U. S. C. § 1001 *et seq.*, or by other provisions of the LMRA, may make a different remedy appropriate for a violation of the trustee's statutory duties. In this case, however, we are merely confronted with the question whether the employer's right to designate its representative to the board of a jointly administered trust fund is a matter for negotiation with the union or is strictly a matter of management prerogative. The language of the statute, its structure, its purpose, and the history of administration of trust funds pursuant to the Act since it was passed, all support the conclusion that this is a matter of management prerogative over which the union has no right to strike.[17] In my opin-

---

[17] This conclusion is in no way inconsistent with the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1209, the Court's statement to the contrary notwithstanding. See *ante,* at 338–339, n. 22. While Congress sought, in that Act, to enhance the stability of multiemployer plans, it did not address the question presented in this case, nor did it prohibit the withdrawal of employers from such plans. Rather, Congress provided that withdrawing employers must fund a proportional share of a plan's unfunded vested benefits. MPPAA § 104, 94

ion, the Court of Appeals' judgment should be affirmed. I therefore respectfully dissent.

---

Stat. 1217. Thus, the general expressions of concern in the legislative history of this Act must be read in light of the action Congress actually took to allay those concerns.