728 F.2d 80
 115 L.R.R.M. (BNA) 2950, 100 Lab.Cas. P 10,787,
5 Employee Benefits Ca 1733
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
TRUCK DRIVERS LOCAL UNION NO. 449, INTERNATIONAL BROTHERHOOD
OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA
and Al Sgaglione, Executive Director of the New York State
Teamsters Conference Pension & Retirement Fund, Irving
Wisch, Kepler Vincent, T. Edward Nolan, Rocco F. DePerno,
Victor Mousseau, Paul E. Bush, Jack Canzoneri, Trustees of
the New York State Teamsters Conference Pension & Retirement
Fund, Respondents.
 No. 103, Docket 83-4085.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 27, 1983.
Decided Feb. 7, 1984.
 
 Robert A. Doren, Buffalo, N.Y. (Flaherty, Cohen, Grande, Randazzo & Doren, Buffalo, N.Y., of counsel), for intervenor.
 Douglas A. Foss, Rochester, N.Y. (Paul R. Braunsdorf, Harris, Beach, Wilcox, Rubin & Levy, Rochester, N.Y., of counsel), for amicus curiae Bldg. Trades Employers Ass'n.
 T. Neal McNamara, Michael H. Salinsky, Christopher W. Katzenbach, San Francisco, Cal. (Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel), for amicus curiae Western Conference of Teamsters Pension Trust Fund.
 John H. Ferguson, Attorney, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliot Moore, Deputy Associate Gen. Counsel, W. Christian Schumann, Richard A. Cohen, Washington, D.C., of counsel), for petitioner.
 Peter P. Paravati, Utica, N.Y. (Constance J. Angelini, Utica, N.Y., of counsel), for respondent Trustees.
 E. Joseph Giroux, Buffalo, N.Y. (McMahon & Crotty, Buffalo, N.Y., of counsel), for Truck Drivers Local No. 449.
 Before LUMBARD, OAKES and KEARSE, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case presents the very narrow but difficult question whether the National Labor Relations Board (the Board) could properly find a union local and the executive administrator and trustees of a state-wide pension and retirement fund as the Union's agents, in violation of section 8(b)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(3) (1976), by attempting to force certain employers to agree to a midterm modification of their collective bargaining agreements with the Union. We hold that the Board could not do so and accordingly we deny enforcement of the Board's decision and order, reported at 265 NLRB 391 (1982).
 
 
 2
 The Union here is Truck Drivers Local Union No. 449, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (hereinafter the Union). The Employers, who were the charging parties before the Board and are here as the intervenors, are Universal Liquor Corp. (Universal) and Erie Liquor Co., Inc. (Erie), wholesale liquor and wine distributors (the Employers). The pension and retirement fund is the New York State Teamsters Conference Pension and Retirement Fund (the Fund or the pension and retirement fund). The Fund, organized in 1954, operates a so-called multiemployer "Taft-Hartley Trust" under section 302(c)(5) of the Labor Management Relations Act, 29 U.S.C. Sec. 186(c)(5) (1976), and now as well under the Employee Retirement Income Security Act, 29 U.S.C. Secs. 1001-1381 (1976 & Supp. V 1981). The Fund's board of trustees is comprised of eight members, half of whom are chosen by the fourteen or so participating local unions and the other half chosen by the more than 10,000 contributing employers.
 
 
 3
 The Employers charged that the Union and the Fund's administrator and trustees (collectively "the trustees") violated section 8(b)(3) of the Act, 29 U.S.C. Sec. 158(b)(3) (1976), by attempting to force Universal and Erie to contribute to the Fund for seasonal, casual, and part-time employees, although the existing collective bargaining agreements between Erie and Universal, on the one hand, and the Union, on the other, did not provide for their coverage. Thus our first question is whether the collective bargaining agreements did exclude those employees from coverage. If they did, our second question is whether the Board properly found that, in seeking to force the Employers to contribute with threats of termination of participation in the Fund, the Fund's trustees acted as agents of the Union; absent that finding, the case for an unfair labor practice falls against both trustees and the Union.[1] On both questions the Board overturned its administrative law judge. We turn first to the collective bargaining agreements.
 
 
 4
 We hold that there is substantial evidence to support the Board's findings that the respective collective bargaining agreements, which had identical pension coverage provisions, did not provide for pension coverage for seasonal, casual, and part-time employees. Article VI of the original agreements, effective from August 1, 1976, to July 31, 1979, and covering bargaining units consisting of truck drivers and warehousemen, provided as follows:
 
 
 5
 The Employer may hire employees to work as a seasonal, casual, or part-time worker, provided in no case shall such an employee be hired for the purpose of displacing a regular full-time employee or for reducing the normal complement of regular, full-time employees. Such an employee shall not become a seniority employee under this Agreement where it has been agreed by the Employer and the Union that such employee was hired for seasonal, casual or part-time work.... Such seasonal, casual or part-time employees shall not be entitled to any fringe benefits under this Agreement or contributions with respect thereto, except as required by law.
 
 
 6
 (Emphasis added.) Article XV explicitly provided for contributions to the New York State Teamsters Council Welfare Trust Fund, not here in issue, on behalf of "all casual employees" in addition to "regular" employees. Article XVI, providing for contributions to the Pension and Retirement Fund, made no such specific exception to the general rule of Article VI that seasonal, casual, or part-time employees are not generally entitled to fringe benefits. Instead, contribution was required from each Employer on behalf of "any and all of its employees covered by this Agreement ...." That article further stated:
 
 
 7
 The Employer and the Union hereby agree simultaneously herewith to execute a stipulation submitted by the Pension Trustees setting forth the provisions relating to the Pension Fund as negotiated for the General Freight Agreement and certifying that the Employer has entered into a written agreement containing such provisions. The Fund Trustees may reserve the right to refuse to accept contributions from Employers who fail to execute such stipulation.
 
 
 8
 Both parties in 1976 had signed such a stipulation, the language of which on pension coverage closely tracked the language in Article VI of the collective bargaining agreements.
 
 
 9
 The Union argues that the provision in Article XVI that required contributions for "any and all of its employees covered by this Agreement" included by its own terms casual, seasonal, and part-time employees, since these employees are included in the collective bargaining agreement. The trustees argue that by "this Agreement" the contract was referring to the National Master Freight Agreement and to the New York State Supplement to that agreement. They claim the employees were bound to the pension terms of this agreement by the provision of the collective bargaining agreements cited above, under which all parties agreed to be bound by the pension provisions of the "General Freight Agreement," presumably the National Master Freight Agreement, a contract binding the parties before they signed individual collective bargaining contracts. The administrative law judge found that the New York Supplement to that Agreement provides for pension benefits for seasonal, casual, or part-time employees,[2] and the trustees claim that this coverage must be read into Article XVI of the collective bargaining agreements. The trustees also emphasize that the stipulations concerning the pension plan as signed under the 1976-1979 agreements themselves provided coverage for "any and all regular full-time and any and all other employees covered by this Agreement" (emphasis added).
 
 
 10
 The Board found, however, that the term "this Agreement" in the collective bargaining agreement referred to the stipulation submitted by the Fund's trustees which both parties to the collective bargaining agreements were obliged to sign, and not to the collective bargaining agreements themselves. 265 NLRB 391, 407 (1982). The Board further found that the 1976 stipulations themselves did not call for contributions for casual, seasonal, and part-time employees. Id. at 409. It interpreted the "any and all other employees" language in the stipulations to refer to certain non-Union employees and non-unit Union employees referred to elsewhere in the stipulations. The Board thus interpreted a clause in the stipulations stating that "the provisions, terms and wording in this Stipulation is identical to that in [the] Collective Bargaining Agreement," to mean that the phrase "any and all" employees appearing in the collective bargaining agreements had to be understood as it was meant to be understood in the stipulations--that is, not to refer to casual, seasonal, and part-time employees.[3]
 
 
 11
 The Board supported its conclusion by noting that any exception in the collective bargaining agreements to the general Article VI rule of no fringe benefits for other than full-time employees would presumably be stated explicitly, and that the agreements contain no specific language entitling casual, seasonal, and part-time workers to pension benefits. Most significantly, the Board relied on the past practices of the parties. Both Universal and Erie in the 1976-1979 period generally contributed to the welfare fund for their part-time, seasonal, and casual employees, but neither Employer intentionally contributed to the pension fund for these employees.[4] The Board also took note of the fact that this same question has been litigated in two other fora with ambiguous results: The New York State Department of Labor found that a similar stipulation did not require contribution for casual employees,[5] while the results of litigation in New York state courts involving a somewhat different set of facts suggested a contrary result.[6]
 
 
 12
 Without indicating that we would necessarily have decided the matter as did the Board, we hold that the Board's findings as to the meaning of the pension coverage provisions of the 1976-1979 collective bargaining agreements were supported by substantial evidence, and we give due deference to the Board's reasonable interpretation of labor contracts, in light of its expertise. NLRB v. Southern California Edison Co., 646 F.2d 1352, 1367 (9th Cir.1981); NLRB v. C.K. Smith & Co., 569 F.2d 162, 167 (1st Cir.1977), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978).
 
 
 13
 Having held that the collective bargaining agreements did not mandate pension fund contributions for casual employees, we turn next to the question whether the Union sought to coerce a midterm modification in those pension coverage provisions in violation of section 8(b)(3). The factual circumstances leading to such an allegation are clear and uncontested. In 1979, Erie, Universal, and a third employer negotiated new collective bargaining agreements with the Union, whose chief negotiator was Ervin Walker, the Union business agent. The provisions of the 1976-1979 contracts noted above concerning the pension plan stipulations and pension coverage were incorporated verbatim into the new contracts. There was no discussion in the negotiations about the coverage of the pension plans. Nor were the pension plan trustees in any way involved in the 1979 negotiations. The new agreements were signed on or about September 6, 1979, and Erie and Universal continued to tender contributions to the pension and retirement fund only on behalf of their full-time employees.
 
 
 14
 Under Article 25.02 of the new collective bargaining agreements, the Employers agreed to execute a stipulation submitted by the trustees just as they had done under the previous contracts, "setting forth the provisions relating to the Pension Fund as negotiated for the General Freight Agreement and certifying that the Employer has entered into a written agreement containing such provisions." Such a stipulation (also called a Pension Fund Participation Agreement) was submitted to the Employers, but not by the trustees. Rather, on Union stationery, Walker, as Union business agent, enclosed for signature under date of October 15, 1979, stipulations prepared and signed by the trustees, and then signed by the Union, containing new language explicitly requiring contributions on behalf of all employees "whether full time, part time, casual or seasonal." Company counsel declined to permit their clients to sign, and further exchanges of correspondence took place, with the Union repeating the trustee's demands that the stipulations be signed. Ultimately the trustees declined to accept any contributions to the Fund from the Employers until the stipulations were signed, and notified employees that they were no longer covered.[7]
 
 
 15
 If the trustees have a right to insist on a change in pension coverage which modifies the terms of the collective bargaining agreements, a question we do not reach here, this would result in certain withdrawal liability to the Employers, and cost to the trustees for computation of that liability which the Employers are also required to pay. (See Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. Secs. 1381-1405 (Supp. V 1981)). It is this act of refusing to accept Employer contributions and removing the coverage for all Universal and Erie employees, carrying with it the costs of withdrawal liability, that the Board found coercive.
 
 
 16
 We agree with the Board that the trustees, by their actions, were coercing the Employers to accept a stipulation that had the effect of creating a midterm modification of the Employers' collective bargaining agreements. Had the Union engaged directly in this coercive action, it would clearly constitute a violation of section 8(b)(3). It is concededly an unfair labor practice under that section for a union unilaterally to coerce an employer to accept a midterm modification of a collective bargaining agreement, in light of the definition of collective bargaining found in section 8(d) of the Act, 29 U.S.C. Sec. 158(d) (1976). See NLRB v. Lion Oil Co., 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957). However, section 8(b)(3) applies only to the conduct of a union or its agents, so that to find someone other than a union responsible for a section 8(b)(3) violation, that person must be acting as an agent of the union. Without such a finding of agency, there is no section 8(b)(3) violation, and the Board has no jurisdiction under that section to remedy whatever wrong may have been done.
 
 
 17
 It is settled that in determining agency in connection with a union or an employer, the Board is to apply ordinary common law principles. See NLRB v. International Longshoremen's & Warehousemen's Union, Local 10, 283 F.2d 558, 563 (9th Cir.1960); 93 Cong.Rec. 4435, 6859 (1947) (remarks of Senator Taft). The absence of actual authorization or subsequent ratification is not controlling on the question of agency, and authority to act may be implied or apparent. 29 U.S.C. Sec. 152(13) (statutory definition of agency); NLRB v. Local 3, IBEW, 467 F.2d 1158, 1159 (2d Cir.1972).
 
 
 18
 Applying those common law principles neither narrowly, nor "expansively" as the Board urges,[8] we first must examine in greater detail the record as a whole to see if the Board was justified in overturning the administrative law judge's finding that no agency relationship existed. It was the fact that the Union, rather than the Fund trustees, submitted the pension fund stipulations extending pension coverage to seasonal, casual, and part-time employees which the Board appeared to consider the most significant. That the Union acted through its business agent, Walker, who had been the chief negotiator in the 1979 contract negotiations but had not brought up the subject of pension coverage in those negotiations, was also deemed significant. The Board further found the Union and the trustees to have been acting in concert from the fact that they both demanded that the Employers sign the stipulations, and repeatedly backed up each other's demands, and from the fact that the Union never protested when the trustees threatened to terminate pension benefits to its members, and then made good on that threat. The Union, it is argued by the General Counsel, thereby acquiesced in the trustees' actions even though they adversely affected the pension rights of all of the regular full-time employees represented by the Union. In any event, the Board found that the Union's actions were "intertwined" with the trustees' actions and that both the trustees and the Union were "pursuing the Union's own interest" so that the trustees were therefore acting on behalf of the Union and as agents of the Union. 265 NLRB at 412-15.
 
 
 19
 A recent Supreme Court case dealing with trustees governed by both Taft-Hartley and ERISA, NLRB v. Amax Coal Co., 453 U.S. 322, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981), sheds considerable light on the question whether such "intertwined" activities as a matter of law can lead to the finding of an agency relationship. Amax held that employer-selected trustees of a trust fund were not representatives of the employer "for the purposes of collective bargaining or the adjustment of grievances" within section 8(b)(1)(B) of the Act. It held that the language of the two Acts and their legislative histories "demonstrate that an employee benefit fund trustee is a fiduciary whose duty to the trust beneficiaries must overcome any loyalty to the interest of the party which appointed him." Id. at 334, 101 S.Ct. at 2796. The Court noted that "Congress treated the issues of multiemployer bargaining units and multiemployer trust funds quite distinctly," and concluded that "[t]he atmosphere in which employee benefit trust fund fiduciaries must operate, as mandated by section 302(c)(5) and ERISA, is wholly inconsistent with [the] process of compromise and economic pressure" of collective bargaining. Id. at 335, 336, 101 S.Ct. at 2797. At the same time, as the Board in its opinion herein pointed out, the Amax Court said that
 
 
 20
 the management-appointed and union-appointed trustees do not bargain with each other to set the terms of the employeremployee contract; they can neither require employer contributions not required by the original collectively bargained contract, nor compromise the claims of the union or the employer with regard to the latter's contributions.
 
 
 21
 Id. at 336, 101 S.Ct. at 2797.
 
 
 22
 Amax suggests that pension fund trustees acting within their authority cannot, as a matter of law, be considered union agents. The question becomes, then, whether the trustees here were at the same time violating their fiduciary duty as Fund trustees, and doing so to further the collective bargaining aims of the Union. The Board's argument is that the trustees sought to require the Employers to make contributions "not required by the original collectively bargained contract," and insofar as they did so they stopped acting as independent trustees and became agents of the Union.
 
 
 23
 The Board principally relies on two of its own cases, Warehousemen's Union Local 334, Teamsters (Halle Brothers), 253 NLRB 1090 (1981), and Local 80, Sheet Metal Workers International Association, AFL-CIO (Turner-Brooks, Inc.), 161 NLRB 229 (1966), to support this conclusion. In Halle Brothers, the trustees of a Taft-Hartley trust established a vision care plan for employees even though the employers had refused to agree to such a plan during contract negotiations. The Board rejected the argument that the employers had consented to abide by the trustees' discretionary creation of a vision care plan merely because they executed declarations of trust in which they agreed to be bound by the acts of the trustees. The Board finds Halle Brothers analogous to the present situation, and argues that here the right to require stipulations signed by both parties did not give the trustees a blank check to alter the terms of the collective bargaining agreements. The Board found in Halle Brothers that the union's trustees "were speaking with a union voice" when they attempted to institute the vision plan.
 
 
 24
 Significantly, however, the Ninth Circuit denied enforcement of the Board's order in Halle Brothers. NLRB v. Driver Salesmen, Local 582, 670 F.2d 855 (9th Cir.1982). It took the view that the trustees acted independently of the union in implementing the vision care benefits. It pointed out that the vision care proposal could not have passed without the majority vote of union and employer trustees and that the "challenged decision was made by the Trust." NLRB v. Driver Salesmen Local 582, 670 F.2d at 859. Halle Brothers is, of course, a stronger case for a finding of an agency relationship than the case before us. Here, there is no evidence that the Union tried and failed to extend pension coverage to less than full-time employees during collective bargaining, and thus that the pension trustees are seeking to gain an objective that eluded the Union in collective bargaining.
 
 
 25
 In Turner Brooks, the Board found that the trustees whose actions were circumscribed by the provisions of a collective bargaining agreement were agents of both the union and the employer, and when they could not and did not accept payments tendered by the employer because of restrictions imposed on them by the collective bargaining agreement, they were found to have been acting on behalf of the union. 161 NLRB at 234. So, too, here it is argued that the trustees were acting on behalf of the Union, which did not protest to the trustees when they refused to accept contributions for full-time employees, but rather fully supported the trustees' erroneous interpretation of the collective bargaining agreements. As the Amax case makes clear, however, the crucial question when determining an agency relationship in this context is not whether union goals and trust fund goals correspond, but rather whether the trust fund has illegally injected itself into the collective bargaining process by taking one side's bargaining goals and unilaterally forcing them upon the other.
 
 
 26
 All that the evidence indicates here is that the trustees imposed their own goals upon the parties. As the trustees point out, they were expressly required under the agreement and declaration of trust to "establish a funding policy ... consistent with the objectives of the plan." They claim that the plan provides coverage for casual, seasonal, and part-time employees and that the provision in the plan that a participant receives credit for "hours worked" enables a casual, seasonal, or part-time employee who works for several employers to accumulate sufficient credits for benefits under the plan. Moreover, the trustees' policy obviously enhances the Fund's fiscal viability since some of the casual, seasonal, and part-time employees are unlikely to draw benefits. From all of this it appears that the trustees were acting for the Fund's purposes, and not as agents of the Union.
 
 
 27
 Thus this case is distinguishable from Turner Brooks, where the union was using the trust funds as a club to accomplish union goals. There, the employer was compelled to contribute to an industry advancement fund against its wishes, by a contract requirement that prohibited the trustees of the other benefit funds from accepting any contributions unless contributions to the advancement fund were also paid. The industry advancement fund benefited the union alone, and when the other benefit funds were contractually obliged to refuse to accept payments from the employers, they were merely furthering a union objective. 161 NLRB at 234-35. Here, on the other hand, there is nothing to show that the Union directed or even requested the trustees to require contributions on the casuals, seasonals, and part-timers. Nor were the pension trustees forced to act as they did because of a restriction in the collective bargaining agreement. There is no evidence to show that Local 449 participated in any way in the formulation of the Fund rule. Nor is there any evidence that on the whole the Union benefits from such a rule.
 
 
 28
 Likewise, there was no evidence here that the Employer-chosen trustees did not vote with the Union-chosen trustees in connection with seeking to require contributions. Nor was there any showing that the Employer-chosen trustees were unduly influenced by the Union-chosen trustees in making their decision. Although the Union bargaining agent was a trustee, he was a trustee of the welfare fund, not the pension and retirement fund. In this case, as in NLRB v. Driver Salesmen Local 582, the Board "has not demonstrated that the Union controlled the Trust when the trustees voted to implement [the] benefits." 670 F.2d at 858. With over 10,000 employers and 14 locals involved in making contributions to this multiemployer pension and retirement fund, the collective bargaining agreements of almost every single other employer require the payment of contributions for casual, seasonal, and part-time employees. Nothing indicates that the Fund was even particularly concerned with the Universal and Erie contracts, or with the problems of Local 449, when it decided to require full employee participation as a prerequisite for Fund participation.
 
 
 29
 To be sure, the Union did agree with the trustees' position regarding coverage for these employees; at least it signed the proposed stipulations and forwarded them to the Employers. But as the Board itself stated in International Union of Operating Engineers, Local Union 12 (Griffith Co.), 243 NLRB 1121, 1125 (1979), "the fact that the interests of the administrator in this case harmonize with or parallel those of the trust settlors does not in itself give rise to an agency relationship between them." The Board's order in a case finding that pension fund trustees were not acting as union agents when they threatened to inform the union of its right to strike certain employers who were not up to date in pension payments, was enforced by the Ninth Circuit in Griffith Co. v. NLRB, 660 F.2d 406, 411 (9th Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982), the court saying, "[t]here is nothing in the facts which would support a finding of agency."
 
 
 30
 This is not to say that pension trustees can never act as union agents and be subject to the Board's jurisdiction. That is a question implicitly left open by the Amax decision, and one that we do not reach today. In Griffith Co., 660 F.2d at 410, the court said that action by the trustees may be attributed to the union in at least three factual situations:
 
 
 31
 1. Where provisions of a collective bargaining agreement remove the discretion to administer the trust funds solely for the benefit of the employees or the trust fund (Turner Brooks, 161 NLRB 229 (1966));
 
 
 32
 2. Where the trustees' actions were in fact directed by union officials (Jacob Transfer, Inc., 227 NLRB 1231, 1232 (1977)); or
 
 
 33
 3. Where the trustees' acts were undertaken in their capacities as union officials rather than as trustees (NLRB v. Construction & General Laborers' Union Local 1140, 577 F.2d 16, 21 (8th Cir.1978), cert. denied, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979)).
 
 
 34
 Even assuming that in these three situations, at least, trustees' actions may be attributed to the union, there is insufficient evidence on the record in this case to support any finding that one of these situations was present. Instead, the Board's finding of an agency relationship relies heavily on the fact that the trustees forwarded the proposed stipulations first to the Union for its signature, with the Union then forwarding the signed stipulations to the Employers. Standing alone these facts fall short of constituting substantial evidence which would support the Board's finding of agency. The stipulations had to be sent to someone first by the trustees if they were to be sent at all. The place for the signature of the Union is at the left side of the proposed stipulations and the place for the signature of the Employer is at the right. For all that appears, the trustees simply thought that the stipulations should be mailed to the Union first. The fact that Walker, the business agent, both signed the stipulations and forwarded them is in and of itself insignificant since he was the business agent of the Union.
 
 
 35
 There being no agency relationship between the Union and the trustees who performed the coercive act, the case must fall. But this means only that neither the Union nor the trustees committed an unfair labor practice. Whether the trustees have the right to impose a condition under a multiemployer pension fund on an individual employer who has not agreed to the condition in his collective bargaining agreement is another question for another day. We have previously noted that a case raising this question is pending in the Western District of New York.[9]
 
 
 36
 Enforcement denied.
 
 
 
 [1]
 Absent a finding of agency, the Union's action, standing alone, amounted to nothing other than a request that the Employers sign participation stipulations. See NLRB v. Driver Salesmen Local 582, 670 F.2d 855, 859-60 (9th Cir.1982). Even if the case for unfair labor practices falls, the legal question would remain for resolution elsewhere whether the trustees can lawfully extend coverage of the plan to casual, part-time, and seasonal employees irrespective of the terms of the collective bargaining agreements establishing more narrow coverage. There is a pending case in the United States District Court for the Western District of New York, originally brought by the Building Trades Employers' Association, which also filed an amicus brief in the instant appeal on behalf of the Employers, involving essentially the same contractual issues as those here. In that case the district court, granting summary judgment for the trustees, has held that they had the right to refuse to accept funds from employers who refused to sign a stipulation. Morse v. New York State Teamsters Conference Pension and Retirement Fund, 580 F.Supp. 180 (W.D.N.Y. 1983)
 
 
 [2]
 The pension provisions in the New York Supplement are in fact ambiguous as to pension coverage. One section refers to covered employees as "any and all employees covered by this Agreement," while another states that the Fund "shall be open to participation by any group of members belonging to a participating Local Union."
 
 
 [3]
 In finding that the stipulations unambiguously did not provide pension coverage for non-full-time employees, the Board implicitly declined to place any weight on the administrative law judge's finding that the New York Supplement to the National Master Freight Agreement required participation for all unit employees. We agree with the Board that the ambiguous language in the New York Supplement, a document mentioned neither in the collective bargaining agreements nor in the stipulations, is not helpful in interpreting the "any and all employees" language in the stipulations
 
 
 [4]
 Universal sporadically contributed to the pension fund for its casual employees due to clerical error
 
 
 [5]
 In S.M. Flickinger Co. v. Ross (Nos. PR-20-79, PR-21-79, May 15, 1980), the New York State Department of Labor, Industrial Board of Appeals rejected a ruling of the New York Industrial Commissioner that a similar stipulation executed by another employer required contributions for casuals
 
 
 [6]
 In William H. Mosley, Sr. v. Erie Liquor Co., the trustees brought suit against Erie in New York Supreme Court (County of Oneida, Sept. 2, 1978) relying on the stipulation and arguing that it was incorporated into the collective bargaining agreement. The suit was, however, not pursued. In Boulter Carting Co. v. DePerno, No. 647/1979 (N.Y.Sup.Ct., Monroe County, Aug. 2, 1978), remanded, 72 A.D.2d 939, 421 N.Y.S.2d 483 (1979), on remand No. 647/1979 (N.Y.Sup.Ct., Monroe County, May 9, 1980), the question posed was whether the employer had to contribute to a pension fund for its nonunion employees. In granting summary judgment for the employers, the court held that the words "this Agreement" found in the collective bargaining agreement and in a stipulation prepared by the trustees referred to the contract and not to the stipulation. After remand, the court in dicta stated that union casual employees were covered by the pension provisions of the contract, which were identical to the provisions of the contract at issue here
 
 
 [7]
 A provision of the collective bargaining agreements reserved to the trustees a right to refuse contributions from employers failing to execute the stipulation
 
 
 [8]
 The Board refers to dicta in a Fifth Circuit footnote to the effect that "the statutory test for imputing liability is based upon principles of agency to be applied expansively in accordance with the underlying policy of the Act." NLRB v. Big Three Industrial Gas & Equipment Co., 579 F.2d 304, 309 n. 4 (5th Cir.1978), cert. denied, 440 U.S. 960, 99 S.Ct. 150, 59 L.Ed.2d 773 (1979). We find nothing in the underlying policy of the Act dictating an expansive application of agency principles, at least when, as here, the expansive application comes in an attempt to extend the Board's jurisdiction to pension fund trustees whose activities are regulated by sets of federal laws different from those administered by the Board. See NLRB v. Amax Coal Co., 453 U.S. 322, 338, 101 S.Ct. 2789, 2798, 69 L.Ed.2d 672 (1981); NLRB v. Driver Salesmen Local 582, 670 F.2d at 859-60
 
 
 [9]
 See supra note 1