RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0273p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

JENNIFER MASON, et al.,

> *Plaintiffs-Appellees,*

*v.*

LOCKWOOD, ANDREWS & NEWNAM, P.C., a Michigan corporation; LOCKWOOD, ANDREWS & NEWNAM, INC., a Texas corporation,

> *Defendants-Appellants,*

LEO A. DALY COMPANY, a Nebraska corporation,

> *Defendant.*

No. 16-2313

---

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:16-cv-10663—John Corbett O'Meara, District Judge.

Argued: November 7, 2016

Decided and Filed: November 16, 2016

Before: GRIFFIN, KETHLEDGE, and DONALD, Circuit Judges.

---

**COUNSEL**

**ARGUED:** S. Vance Wittie, SEDGWICK LLP, Dallas, Texas, for Appellants. Mark L. McAlpine, MCALPINE PC, Auburn Hills, Michigan, for Appellees. **ON BRIEF:** S. Vance Wittie, SEDGWICK LLP, Dallas, Texas, Robert G. Kamenec, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants. Mark L. McAlpine, Jayson E. Blake, Adam T. Schnatz, MCALPINE PC, Auburn Hills, Michigan, for Appellees.

GRIFFIN, J., delivered the opinion of the court in which DONALD, J., joined. KETHLEDGE, J. (pp. 19–23), delivered a separate dissenting opinion.

1

---

**OPINION**

---

GRIFFIN, Circuit Judge.   This state-law professional negligence proposed class action suit arises out of the Flint Water Crisis, a public health disaster that drew national media coverage when the City of Flint decided to supply water to its residents using the Flint River without implementing necessary anti-corrosion measures.  The series of events precipitating the tragedy have little to do with the issue before us on appeal.  We deal, instead, with a question of procedure:   must plaintiffs litigate their claim in state or federal court?  In 2005, Congress revised the contours of federal diversity jurisdiction, making it easier to remove class actions to federal court, while at the same time providing an exception for cases that are "truly local in nature," commonly called the "local controversy" exception.  The parties dispute whether plaintiffs' claim against defendants (civil engineering companies responsible for upgrading Flint's municipal water system) belongs in state court under this exception.  Though the Flint Water Crisis captured the attention of the nation, its infamy does not make it any less local.  Because plaintiffs' suit consists of a proposed class of more than two-thirds Michigan citizens, a significant local defendant, and injuries limited to the reach of Flint's water system, it satisfies the statutory requirements of the local controversy exception.  We therefore affirm the district court's decision to remand this case to state court.

I.

In 2005, Congress enacted the Class Action Fairness Act (CAFA) in response to "perceived abusive practices by plaintiffs and their attorneys in litigating major class actions with interstate features in state courts." *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1243 (10th Cir. 2009).  CAFA "loosened the requirements for diversity jurisdiction," *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 739 (2014), authorizing federal district courts to "hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" *Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1348 (2013) (quoting 28 U.S.C. § 1332(d)(2), (d)(5)(B)).  That expansion of diversity jurisdiction was with exceptions.  *See*

28 U.S.C. § 1332(d)(3), (d)(4)(A), (d)(4)(B).    One, which Congress called the "Local Controversy Exception," S. Rep. No. 109-14 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 28, is codified at § 1332(d)(4)(A).    Under this exception, "[a] district court shall decline to exercise jurisdiction . . . over a class action" if:

> (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
>
> (II) at least 1 defendant is a defendant--
>
>> (aa) from whom significant relief is sought by members of the plaintiff class;
>>
>> (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and
>>
>> (cc) who is a citizen of the State in which the action was originally filed; and
>
> (III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
>
> (ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons[.]

§ 1332(d)(4)(A).  If these four elements are present, the district court must abstain from hearing the case, despite having jurisdiction under § 1332(d)(2).

Like all statutes, the text of CAFA controls.  *Caminetti v.United States*, 242 U.S. 470, 485 (1917); *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1060 (6th Cir. 2014).  In this regard, its text must be read as a whole, not in isolation. *United States v. Morton*, 467 U.S. 822, 828 (1984).  The relaxation of normal diversity requirements is coupled with an exception for local controversies. The terms of the statute balance considerations of federalism—a balance defined by Congress, but implemented and respected by the federal courts.

II.

In April 2013, the City of Flint, Michigan, decided to switch its primary drinking water provider from the Detroit Water and Sewerage Department ("DWSD") to the newly formed Karegnondi Water Authority ("KWA"). The KWA would not be operational for another three years, however, so Flint needed an interim source of drinking water. It decided to draw from the Flint River, which had previously supplied back-up water services to the City. Relying on the Flint River, however, posed a few problems. According to several reports, the river was a highly sensitive drinking water source that required anti-corrosive treatment in order to prevent heavy metals from leaching into the water. On top of that, these issues needed to be remedied quickly, as the City's contract with DWSD was set to expire a year later in April 2014.

The City turned to Lockwood, Andrews & Newnam, Inc., a Texas-based corporation that touted itself as a "national leader in the heavy civil infrastructure engineering industry," and its Michigan-based affiliate, Lockwood, Andrews & Newnam, P.C. (collectively, "defendants") for assistance. On June 26, 2013, the City entered into a contract with defendants for design engineering services in connection with rehabilitating Flint's Water Treatment Plant ("the Plant"). After confirming with City officials that they could make the necessary improvements and provide the necessary "quality control" in time for the April 2014 switch, defendants proceeded to develop rehabilitation plans for the Plant. In April 2014, the Michigan Department of Environmental Quality approved defendants' rehabilitation plans. Notably, the plan did not include necessary upgrades for anti-corrosive treatment measures. Indeed, earlier that month, defendants and officials from the City and the Michigan Department of Environmental Quality considered the issue, but decided that more data was advisable before implementing any measures for "optimization for lead."

On April 25, 2014, the City of Flint began supplying its residents drinking water from the Flint River. The harmful effects were as swift as they were severe. Within days, residents complained of foul smelling and tasting water. Within weeks, some residents' hair began to fall out and their skin developed rashes. And within a year, there were positive tests for E. coli, a spike in deaths from Legionnaires' disease, and worst of all, reports of dangerously high blood lead levels in Flint children. All of this resulted, according to one expert who studied the crisis,

because the "water from the Flint River was 19 times more corrosive than the water pumped from Lake Huron by the DWSD, and that without corrosion control treatment, lead was leaching out of the lead-based service lines at alarming rates and finding its way to the homes of Flint's residents." In his view, it was "predictable," but preventable.

## III.

On January 25, 2016, eight Flint residents filed suit in state court, alleging one count of professional negligence against defendants. Plaintiffs contended that defendants knew the Plant required upgrades for lead contamination treatment, yet failed to ensure such safeguards were implemented as part of the rehabilitation, resulting in widespread personal injuries and property damage. They sought relief on behalf of themselves and all other similarly situated "residents and property owners in the City of Flint" who used water from the Flint River from April 25, 2014, to the present day.

Defendants removed the action to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332(d)(2). Plaintiffs filed a motion to remand to state court. They did not contest the basic requirements for diversity jurisdiction under CAFA. They argued instead that the mandatory "local controversy" exception to CAFA jurisdiction applied. Plaintiffs asserted that the class citizenship and principal injuries elements were not in dispute, citing the allegations in their complaint that the class consisted of Flint residents and that their injuries were suffered in Flint. They also argued that LAN, P.C., a Michigan professional corporation, was a significant defendant because it was the entity responsible under Michigan law for certifying that defendants' work satisfied applicable standards of care. Finally, they contended that no party had filed a similar suit against defendants in the past three years.

Defendants countered that the class citizenship element was very much in dispute and that the mere allegation of residency, alone, was not sufficient to establish citizenship. Defendants also argued that the mere fact that LAN, P.C. certified the engineering plans does not establish its conduct formed a significant basis of plaintiffs' negligence claim. Rather, LAN, Inc., a Texas corporation, was the more significant defendant since it contracted with Flint to provide the engineering services that plaintiffs alleged were negligently performed.

The district court granted plaintiffs' motion to remand. It found that more than two-thirds of the putative class members were likely Michigan citizens. Relying primarily on the rebuttable presumption of domicile based on residency and the absence of any contrary evidence, the court also observed that the proposed class consisted of residents who, over a relatively limited period of time, experienced a continuing injury localized in Flint. The court also found that LAN, P.C.'s (the Michigan defendant's) conduct formed a significant basis of plaintiffs' claim because defendants' engineering services were provided "through LAN, P.C."

Defendants timely petitioned for permission to appeal, which this court granted on September 20, 2016. *In re Lockwood, Andrews & Newnam, P.C.*, No. 16-0102, at 2 (6th Cir. Sept. 20, 2016). Our order initiated a 60-day clock in which we are required to issue a decision. *In re Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 849, 853 (6th Cir. 2012).

IV.

A.

We begin our analysis on an issue that enjoys unanimity, both between the parties and among the circuits, but which is nonetheless an important starting point: the burden of proof. The parties and every circuit to have addressed this issue all agree that the party seeking to remand under an exception to CAFA bears the burden of establishing each element of the exception by a preponderance of the evidence. *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1262 (10th Cir. 2014); *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010); *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 26 (2d Cir. 2010); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 564 F.3d 75, 78 (1st Cir. 2009); *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 153 (3d Cir. 2009); *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1024 (9th Cir. 2007); *Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 680 (7th Cir. 2006); *Frazier v. Pioneer Ams. LLC*, 455 F.3d 542, 546 (5th Cir. 2006); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 (11th Cir. 2006).

We agree with the universal wisdom of our sister circuits for two, interrelated reasons. First, the language of "local controversy" exception indicates that it is not part of the initial jurisdictional calculus. Section 1332(d)(4) provides that "[a] district court shall decline to

exercise jurisdiction under paragraph (2)" if certain conditions are met. Congress's use of "decline" is important. It necessarily implies a prior determination of jurisdiction, since "a court could not 'decline' jurisdiction that it never had in the first place." *Clark v. Lender Processing Servs.*, 562 F. App'x 460, 465 (6th Cir. 2014). Second, the longstanding rule is that "whenever the subject matter of an action qualifies it for removal, the burden is on a plaintiff to find an express exception." *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 698 (2003). Just as nothing in CAFA alters the traditional rule that the removing party bears the burden of establishing the jurisdictional elements, *see Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 404 (6th Cir. 2007), we find nothing in the statute indicating that Congress intended to upend *Breuer*'s traditional rule. We therefore hold that the party seeking to remand bears the burden of establishing an exception to CAFA jurisdiction by a preponderance of the evidence.

Plaintiffs, as the moving party, must establish all four elements of the local controversy exception. But, as defendants only contest the two-thirds citizenship and "significant basis" requirements, we confine our inquiry to those elements. We take each in turn.

B.

The first element of the local controversy exception requires the movant to show that "greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed[.]" § 1332(d)(4)(A)(I). "Citizen" and its variant "citizenship" have acquired a particular meaning in our law as being equivalent to "domicile." *Von Dunser v. Aronoff*, 915 F.2d 1071, 1072 (6th Cir. 1990) ("State citizenship . . . is equated with domicile."); *see also N.L.R.B. v. Amax Coal Co., a Div. of Amax*, 453 U.S. 322, 329 (1981) ("Where Congress uses terms that have accumulated settled meaning . . . , a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). Thus, although the statute speaks in terms of citizenship, a party invoking the local controversy exception is effectively tasked with establishing the domicile of the proposed class members.

According to their complaint, plaintiffs seek to represent all "residents and property owners in the City of Flint" who used water from the Flint River from April 25, 2014, to the

present day, and were thereby injured by defendants' professional negligence. Defendants contend that the district court erred in finding that, more likely than not, two-thirds of this proposed class were citizens of Michigan.

In evaluating defendants' challenge, two long-standing propositions of law inform our analysis. The first relates to our standard of review: an appellate court will not disturb a district court's factual findings, including those regarding the citizenship of parties, "unless the record leaves us with the definite and firm conviction that a mistake has been committed." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 625 (6th Cir. 2016) (bracketing and quotation marks omitted); *Cameron v. Children's Hosp. Med. Ctr.*, 131 F.3d 1167, 1170 (6th Cir. 1997) (recognizing that citizenship is question of fact). The second relates to the substantive law of domicile: the law affords a rebuttable presumption that a person's residence is his domicile. *See, e.g.*, *D.C. v. Murphy*, 314 U.S. 441, 455 (1941). Taken together, these principles lead us to affirm the district court's holding that plaintiffs satisfied the two-thirds citizenship requirement.

In elemental terms, domicile consists of (1) residence and (2) an intent to remain there. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). In practice, however, the law of domicile has long been one of presumptions. In his Commentaries on the Conflict of Laws, for example, Joseph Story listed over a dozen such presumptions, including: a person's place of birth is presumptively their domicile; a child's domicile is presumptively that of their parents; and, most important for our purposes, "*primâ facie*, the place, where a person lives, is taken to be his domicil, until other facts establish the contrary." Joseph Story, Commentaries on the Conflict of Laws, § 46 (5th ed. 1857).

In recognizing the primacy of residency in the domicile calculus, Story was simply drawing from established legal tradition. As early as 1790, England's House of Lords declared that "[a] person's being at a place is *primâ facie* evidence that he is *domiciled* at that place, and it lies on those who say otherwise to rebut that evidence." *Bruce v. Bruce*, 2 Bos. & Pull. 229, note (a). Not long after, the presumption made its way into American law. *See* 10 Am. & Eng. Ency. Law, Domicile, at 22 (2d ed.) (collecting early state and federal cases). In 1852, the United States Supreme Court announced that "[w]here a person lives, is taken *primâ facie* to be his domcil, until other facts establish the contrary." *Ennis v. Smith*, 55 U.S. 400, 423 (1852). And in

the 150 years since, the rule of thumb on residency and domicile has remained fixed:  "The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary." *Murphy*, 314 U.S. at 455; *Anderson v. Watts*, 138 U.S. 694, 706 (1891); *Mitchell v. United States*, 88 U.S. 350, 352 (1874); *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571 (5th Cir. 2011); *Krasnov v. Dinan*, 465 F.2d 1298, 1300 (3d Cir. 1972); *Walden v. Broce Const. Co.*, 357 F.2d 242, 245 (10th Cir. 1966); *Fort Knox Transit v. Humphrey*, 151 F.2d 602, 602 (6th Cir. 1945); 28 C.J.S. Domicile § 45; 39 Am. Jur. Proof of Facts 2d 587, § 8.

We emphasize the historical pedigree of the residency-domicile presumption because the district court primarily based its finding that plaintiffs met their burden under § 1332(d)(4)(A)(I) on the same.  As a class that consists of Flint residents, the district court was correct, in light of the long-standing authority charted above, to afford plaintiffs the rebuttable presumption that each resident class member was domiciled there.  Rather than rebut the presumption with evidence undermining the inference, defendants countered that merely alleging residency cannot, as a matter of law, suffice to satisfy the burden of demonstrating citizenship.

In support of their assertion, defendants point to a competing line of case law holding that "naked averment of . . . residence . . . is insufficient to show his citizenship."  *Robertson v. Cease*, 97 U.S. 646, 648 (1878).  This principle also enjoys a rich pedigree in our law.  *See, e.g.*, *Bingham v. Cabot*, 3 U.S. (3 Dall.) 382, 383–84 (1798) ("str[iking] off the docket" many cases that alleged residence rather than citizenship); *Steigleder v. McQuesten*, 198 U.S. 141, 143 (1905) ("[I]t has long been settled . . . that a mere averment of residence in a particular state is not an averment of citizenship in that state for the purposes of jurisdiction.").  More significantly for defendants, many cases, including several from the CAFA context, have explicitly rejected the residency-domicile presumption based on the proposition that mere averment of residency cannot establish citizenship.  *See, e.g.*, *Reece v. AES Corp.*, 638 F. App'x 755, 769 (10th Cir. 2016) (stating in the CAFA exception context, "To be sure, the place of residence is *prima facie* the domicile.  But allegations of mere residence may not be equated with citizenship" (internal quotations omitted); *Johnson v. Advance Am.*, 549 F.3d 932, 937 n.2 (4th Cir. 2008) ("For purposes of diversity jurisdiction, residency is not sufficient to establish citizenship.").

On closer inspection, however, we are not persuaded this line of cases presents compelling authority for rejecting the residency-domicile presumption in this case. The reason for this lies in the context from which the "mere averment of residency" line of cases emerged— federal subject-matter jurisdiction.

In that context, "[t]he established rule is that a plaintiff, suing in a federal court, must show in his pleading, affirmatively and distinctly, the existence of whatever is essential to federal jurisdiction[.]" *Smith v. McCullough*, 270 U.S. 456, 459 (1926). This long-settled principle derives from the fact that federal courts are courts of *limited* jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). As a consequence of this restriction on federal judicial power, federal jurisdiction may not be "maintained by mere averment," *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189 (1936), "inferred argumentatively," *Brown v. Keene*, 33 U.S. 112, 115 (1834), or "supplied by inference," *La Belle Box Co. v. Stricklin*, 218 F. 529, 533 (6th Cir. 1914). Put differently, and in terms germane to the present discussion, there is a *presumption* against federal jurisdiction. *Kokkonen*, 511 U.S. at 377; *Thomas v. Bd. of Trustees of the Ohio State Univ.*, 195 U.S. 207, 218 (1904); *Vander Boegh*, 772 F.3d at 1064.

The tension between the residency-domicile presumption and the presumption against federal jurisdiction came to a head in *Robertson v. Cease*, 97 U.S. 646 (1878). In that case, the plaintiff argued that "a general allegation of residence, without indicating the character of such residence, whether temporary or permanent, made a *prima facie* case of right to sue in the Federal courts." *Id.* at 649. The Court rejected the contention because, "[a]s the jurisdiction of the Circuit Court is limited in the sense that it has none except that conferred by the Constitution and laws of the United States, the presumption . . . is[] that a cause is without its jurisdiction unless the contrary affirmatively appears." *Id.* at 649. From the Court's view, in being asked to adopt the residency-domicile presumption, it was, "in effect, asked, in support of the jurisdiction of the court below, to infer argumentatively, from the mere allegation of 'residence,' that . . . [the plaintiff] had a fixed permanent domicile in [Illinois]." *Id.* at 650. The Court could not accept that proposition because, under well-settled precedent defining the federal courts' diversity jurisdiction, the facts establishing diversity jurisdiction could not "be inferred argumentatively

from its averments," *id.* at 650 (quoting *Brown*, 33 U.S. at 115), but rather must "be distinctly and positively averred in the pleadings," *id.* at 649.

By tracing the origin of the "mere averment of residency" line of cases, we see that the residency-domicile presumption was not rejected because it was specious (indeed, *Robertson* could "not . . . den[y] that there is some force in the[] suggestion[]," *id.*), but because, in the unique context of federal diversity jurisdiction, a contrary presumption of constitutional import takes precedence. *See Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884) ("[T]he rule, springing from the nature and limits of the judicial power of the United States, is inflexible and without exception."); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (rooting federal courts' limited jurisdiction in Article III of the Constitution).

Though the residency-domicile presumption did not prevail against the unrelenting headwinds of limited federal jurisdiction, there is no reason it should suffer a similar fate under the local controversy exception. As established at the outset of our analysis, the local controversy exception is not jurisdictional. *See also Clark*, 562 F. App'x at 465 (holding that "the exceptions are not jurisdictional"); *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 869 (9th Cir. 2013) (same); *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 142 (2d Cir. 2013) (same); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (same); *Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 636 F.3d 971, 973 (8th Cir. 2011) (same). Thus, a party asserting the exception does not encounter a similar countervailing presumption that neutralizes residency's presumptive force in establishing domicile. In this context, it would function like a rebuttable presumption does in any other setting: shifting the burden to the opposing party to rebut the inference and permitting, but not requiring, the district court to find the ultimate fact. *See, e.g.*, 2 McCormick On Evid. § 342 (7th ed.).

Indeed, the residency-domicile presumption fits particularly well in the CAFA exception context, where the moving party is tasked with demonstrating a fact-centered proposition about a mass of individuals, many of whom may be unknown at the time the complaint is filed and the case removed to federal court. *See* Nicole Ochi, *Are Consumer Class and Mass Actions Dead? Complex Litigation Strategies After CAFA & MMTJA*, 41 Loy. L.A. L. Rev. 965, 1030 (2008) ("To achieve the objective of these [CAFA] exceptions, courts should grant plaintiffs a

presumption of citizenship when they define their classes according to state residency."); Stephen J. Shapiro, *Applying the Jurisdictional Provisions of the Class Action Fairness Act of 2005: In Search of a Sensible Judicial Approach*, 59 Baylor L. Rev. 77, 135 (2007) (advocating the same). The citizenship inquiry under the local controversy exception should not be "exceptionally difficult," *Mondragon v. Capital One Auto Fin.*, 736 F.3d 880, 886 (9th Cir. 2013), but instead "practical and reasonable." *Hollinger*, 654 F.3d at 572. Affording the moving party a rebuttable presumption of citizenship based on residency avoids the exceptional difficulty of proving the citizenship of a class of over 100 individuals, given the nature and timing of the citizenship inquiry under the local controversy exception. *See id.* at 573 (5th Cir. 2011) ("[W]here a proposed class is discrete in nature, a common sense presumption should be utilized in determining whether citizenship requirements have been met.").

Those circuits that have rejected the rebuttable presumption in the CAFA context have relied on case law addressing federal subject-matter jurisdiction. *See Reece*, 638 F. App'x at 769 (citing *Whitelock v. Leatherman*, 460 F.2d 507, 514 (10th Cir. 1972) ("[A]llegations of mere 'residence' may not be equated with 'citizenship' for the purposes of establishing diversity.")); *In re Sprint Nextel Corp.*, 593 F.3d at 673 (citing *Meyerson v. Harrah's E. Chicago Casino*, 299 F.3d 616, 617 (7th Cir. 2002) ("[R]esidence and citizenship are not synonyms and it is the latter that matters for purposes of the diversity jurisdiction.")); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 799 (5th Cir. 2007) (citing *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974) ("For diversity purposes, citizenship means domicile; mere residence in the State is not sufficient.")). However, these decisions extended the "mere averment of residency" principle without accounting for its underlying rationale. The sole basis for eschewing the residency-domicile presumption in *Robertson* was the countervailing, "inflexible" presumption against federal jurisdiction. *Swan*, 111 U.S. at 382; *see Robertson*, 97 U.S. at 649–50. Because the local controversy exception is not jurisdictional, the premise of *Robertson* and its jurisdictional progeny is missing here. Given this material distinction, the line of cases defendants rely on provides no basis for rejecting the residency-domicile presumption in this case.

One district court in our circuit has previously rejected the rebuttable presumption of citizenship for a different, albeit equally unpersuasive, reason. In *Lancaster v. Daymar Colleges Grp., LLC*, the district court declined to adopt the presumption as inconsistent with the proposition that the movant bears the burden of proving citizenship. No. 3:11-CV-157-R, 2012 WL 884898, at *3 (W.D. Ky. Mar. 14, 2012). But this proves too much. Under this rationale, rebuttable presumptions would cease to exist, since the only circumstance in which they serve any purpose is when the beneficiary of the presumption also bears the burden of proof. 1 Jones on Evidence § 4:2 (7th ed.) ("The underlying purpose and impact of a presumption is to affect the burden of proving or disproving the presumed fact."). There is nothing inconsistent with placing the burden of proof on a particular party and also affording them a rebuttable presumption as one way of shouldering that burden. Indeed, our law is quite familiar with the concept. *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993) (affording Title VII plaintiff a rebuttable presumption of unlawful discrimination if she establishes a *prima facie* case); *see also* 2 McCormick On Evid. § 343 (7th ed.) (listing other popular presumptions).

In a similar vein, defendants contend that our approach was rejected by the Seventh Circuit as "guesswork. Sensible guesswork, based on a sense of how the world works, but guesswork nonetheless." *In re Sprint Nextel Corp.*, 593 F.3d at 674. Again, this criticism can be made about presumptions generally. Presumptions are nothing more than common sense inferences "enlightened by human knowledge and experience." 31A C.J.S. Evidence § 204. They are, to use *Sprint*'s phrase, the law's recognition of "how the world works." Defendants' argument constitutes a wholesale rejection of presumptions generally, a position we are disinclined to adopt in the absence of any reason to do so. Having distinguished the only line of authority that other cases have cited to reject the residency-domicile presumption, we see no reason to close our eyes to a centuries-old inference that a person's residence is presumptively his domicile.

The dissent takes issue with our analysis because it purportedly conflicts with the principle of abstention that we have a "virtually unflagging obligation" to exercise jurisdiction given to us. Because we have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given," the dissent contends, "we cannot presume a fact

that allows us to *decline* jurisdiction, any more than we can presume a fact that allows us to find that jurisdiction exists in the first place." (first quoting *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821)).

The dissent's recitation of abstention principles is accurate, but the conclusion it draws from them does not follow. The abstention doctrines the dissent invokes are *judge-made* exceptions to the powerful default rule that Congress alone has the constitutional authority to define the contours of federal jurisdiction. *Zwickler v. Koota*, 389 U.S. 241, 248 (1967). Thus, our "virtually unflagging obligation" stems from a deep sense of prudence, if not constitutional obedience, to listen when Congress directs federal courts to assume jurisdiction over particular controversies. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 359 (1989) ("Underlying these assertions is the undisputed constitutional principle that Congress, and not the Judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds."). But it is because common law abstention reflects a departure from the constitutional norm that the Supreme Court placed strict rules on its use. It is for this reason that the Supreme Court has admonished that abstention is an "extraordinary and narrow exception," *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976), only to be invoked in "narrowly limited 'special circumstances,'" *Zwickler*, 389 U.S. at 248 (1967), and on only the "clearest of justifications," *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002) (quoting *Colorado River*, 424 U.S. at 819).

But all of these common law restrictions on abstention have no place here because Congress has expressly directed courts to decline jurisdiction over local controversies. For this reason, we disagree with the dissent's assertion that "[w]e have nothing like a clear justification for abstention here"—Congress has provided the all justification we need in § 1332(d)(4)(A). We would agree with the dissent that we have a "virtually unflagging obligation" to not decline jurisdiction when Congress's only word on the matter is to exercise jurisdiction. But, when Congress directs something different, our obligation remains with the Constitution and the text of the statute enacted by Congress. And here Congress directed something different. In enacting CAFA, Congress expanded diversity jurisdiction while carving out an exception for "local controversies." Read together and in harmony, CAFA's provisions explicitly instruct federal

district courts to remand class action cases that satisfy the elements of § 1332(d)(4)(A), notwithstanding the fact that the jurisdictional requisites are met. In light of Congress's explicit directive to decline jurisdiction, the dissent's common law abstention principles—born as they were in the context of judicial insubordination toward Congress—are inapplicable.

Furthermore, we would be remiss if we did not also observe that defendants drew the very same residency-domicile inference in their notice of removal. In their notice, defendants alleged that minimal diversity existed because "Plaintiffs were citizens of the State of Michigan." And in support, defendants cited paragraph 2 of the first amended complaint, which merely alleged residency, not citizenship. Yet, defendants insist plaintiffs cannot draw the same inference when it comes to similarly situated Flint residents. Were we to take defendants' and the dissent's argument to its logical end point, we would be compelled—on the very authority that defendants argue requires this case remain in federal court—to conclude that defendants failed to establish the citizenship requirement of federal diversity jurisdiction.

In addition to the presumptive force of residency, there are other attributes of plaintiffs' proposed class that bolster the inference that the putative class members, as residents of Flint, intend to remain there indefinitely. First, according to plaintiffs' class definition, the class members have continuously resided in Flint, Michigan, for several years. *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1228 (S.D.N.Y. 1991) (listing as a relevant domicile consideration "the nature of the residence (i.e., how permanent the living arrangement appears)"); Restatement (Second) of Conflict of Laws, Chapter 2: Domicile, Topic 2 Spec. Note (1971) ("Residing for a considerable time in a place is persuasive evidence of domicil there . . . ."). In this respect, the district court astutely observed, "There are no circumstances—such as a large number of college students, military personnel, owners of second homes, or other temporary residents—suggesting that these Flint residents are anything other than citizens of Michigan." Moreover, by definition, the putative class members are property owners, another strong indicator of domicile. *Edick v. Poznanski*, 6 F. Supp. 2d 666, 669 (W.D. Mich. 1998) (citing 1 Moore's Federal Practice ¶ 0.74[3.3] (1991 & Supp. 1993)). Finally, it bears mentioning that Flint, Michigan, is nowhere near a state line (it lies near the crook of the thumb

in the figurative "Michigan hand"), which further undermines the notion that the traditional residency-domicile inference is not appropriate in this particular case.

Against this backdrop, defendants submitted no evidence to rebut the presumption that the putative class members were citizens of Michigan. Instead, they merely relied on case law from other circuits stating that mere allegations of residency are not sufficient to establish citizenship. They did so at their peril. In light of the long-standing presumption of domicile based on residency, the additional domicile factors apparent from the class definition, and the complete absence of any evidence tending to rebut the presumption of domicile based on residency, we hold that the district court did not clearly err in finding that, more likely than not, more than two-thirds of the proposed class of Flint residents were Michigan citizens.

C.

Defendants also contest the district court's finding that LAN, P.C.'s "alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class." 28 U.S.C. § 1332(d)(4)(A)(i)(II)(bb).

We have yet to interpret this provision, but those circuits that have are in general agreement that this provision "effectively calls for comparing the local defendant's alleged conduct to the alleged conduct of all the Defendants." *Kaufman*, 561 F.3d at 156; *see also Woods*, 771 F.3d at 1266 (following *Kaufman*); *Westerfeld*, 621 F.3d at 825 (same). "The local defendant's alleged conduct must be an *important* ground for the asserted claims in view of the alleged conduct of all the Defendants." *Kaufman*, 561 F.3d at 157. After taking into account the totality of the conduct forming the basis of plaintiff's claims, we must consider whether "the local defendant's alleged conduct is a significant part of the alleged conduct of all the Defendants[.]" *Id.* at 156. If so, the "significant basis" provision is satisfied.

This case involves a single claim of professional negligence against three defendants: LAN, P.C. (a Michigan corporation), LAN, Inc. (a Texas corporation), and Leo A. Daly Company (a Nebraska corporation). The conduct underlying plaintiffs' claim is the provision of engineering design services in connection with upgrades to Flint's Water Treatment Plant,

including drafting and implementing the engineering plans and providing "quality control" measures.

We begin with the third defendant, Leo A. Daly Company. Plaintiffs' complaint does not allege that Leo A. Daly Company engaged in any engineering services. Instead, plaintiffs allege that Leo A. Daly Company is LAN, P.C.'s and LAN, Inc.'s corporate alter ego, thereby making Leo A. Daly Company vicariously liable for LAN's tortious conduct. Given plaintiffs' theory of liability, Leo A. Daly Company's role in plaintiffs' negligence claim is minimal at best.

That leaves LAN, P.C. and LAN, Inc. The complaint alleges professional negligence against both defendants and further alleges that all engineering work was conducted "through LAN, P.C." More specifically, the complaint alleges that LAN, P.C. was formed to conduct LAN, Inc.'s work in Michigan, and that Flint relied on LAN, P.C.—as the LAN entity that "work[ed] with several water systems around the state"—to "perform quality control." The failure to provide that quality control is the very core of plaintiffs' professional negligence claim. We therefore agree with the district court that LAN, P.C.'s conduct forms an "important" and integral part of plaintiffs' professional negligence claim.

Defendants argue that the professional services agreement with the City shows that its professional relationship was with LAN, Inc., not LAN, P.C. Even assuming we may properly consider this extrinsic evidence, *compare Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010, 1015 (9th Cir. 2011) (limiting scope of "significant basis" inquiry to complaint), *with Evans*, 449 F.3d at 1167–68 (considering extrinsic evidence under "significant basis" provision), it does not alter our conclusion. That Flint formally contracted with LAN, Inc. is not inconsistent with plaintiffs' allegation that LAN, Inc. provided its services "through LAN, P.C." Moreover, the agreement acknowledges that LAN, Inc. would not be the only entity providing the services. It states that "all of the obligations required by [LAN, Inc.] under this Contract shall be performed by [LAN, Inc.] *or by others employed by him and working under his direction and control.*" This buttresses plaintiffs' allegation that LAN, P.C., as the LAN entity that "work[ed] with several water systems around the state," was responsible for "perform[ing] quality control," and was the entity "through" which defendants provided their engineering services.

Defendants also argue that, according to plaintiffs' own complaint, LAN, P.C. conducted a majority of its business in LAN, Inc.'s Chicago office. However, the "significant basis" provision is not concerned with where the conduct occurred, but rather with *who* engaged in the conduct. § 1332(d)(4)(A)(i)(II)(bb) (requiring that a local defendant be a defendant "*whose* alleged conduct forms a significant basis for the claims . . . ." (emphasis added)). LAN, P.C. is a Michigan corporation and its conduct—regardless of where it is carried out—is evaluated against that of the other defendants. The allegations that LAN, P.C. was responsible for quality control, in conjunction with the allegation that defendants' engineering work in Flint was conducted "through LAN P.C.," are sufficient to establish that LAN, P.C.'s conduct forms a "significant basis" of plaintiffs' professional negligence claim.

## V.

For the foregoing reasons, we agree with the district court that plaintiffs established the class citizenship and significant basis requirements of the local controversy exception to CAFA. It is also important that we not lose sight of the forest for the trees. The local controversy exception exists to ensure that "a truly local controversy—a controversy that uniquely affects a particular locality to the exclusion of all others"—remains in state court. S. Rep. No. 109-14, 39 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 38. By that definition, and the statutory elements Congress set forth to achieve that vision, the case before us exemplifies the quintessential local controversy. Indeed, it defies common sense to say a suit by Flint residents against those purportedly responsible for injuring them through their municipal water service is not a "local controversy."

For these reasons, we affirm the judgment of the district court.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting.  To meet a burden of proof, a party usually must provide some.  Here, it is common ground that the federal courts have jurisdiction over this case and that the plaintiffs bear the burden of proving that we may lawfully abstain from exercising that jurisdiction.  The plaintiffs have not met that burden, or even tried.

By way of background, the federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress."  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).  Abstention is an "extraordinary and narrow exception" to that duty.  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  Thus, only the "clearest of justifications" will justify abstention.  *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

We have nothing like a clear justification for abstention here.  The federal courts undisputedly have jurisdiction over this case under the Class Action Fairness Act.  *See* 28 U.S.C. § 1332(d).  Instead the question here, broadly stated, is whether we may abstain from exercising that jurisdiction per the Act's so-called "local-controversy exception."  For that exception to apply—and thus for us lawfully to send the case back to state court—the plaintiffs must prove, among other things, both that more than two-thirds of the putative class-members "are citizens of the State in which the action was originally filed" (*i.e.*, Michigan) and that the alleged conduct of the sole Michigan defendant "forms a significant basis for the claims" of the putative class.  *Id.* § 1332(d)(4)(A)(I), (II)(bb).

The plaintiffs have proved neither.  As for the first requirement, every circuit to have considered the issue—five so far—has held that "there must ordinarily be at least some facts in evidence from which the district court may make findings regarding the class members' citizenship for purposes of CAFA's local-controversy exception."  *Mondragon v. Capital One Auto Finance*, 736 F.3d 880, 884 (9th Cir. 2013) (gathering cases); *see also Reece v. AES Corp.*, 638 Fed. App'x 755, 769-70 (10th Cir. 2016); *In re Sprint Nextel Corp.*, 593 F.3d 669, 674-676

(7th Cir. 2010); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 799-801 (5th Cir. 2007); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1166 (11th Cir. 2006). Meanwhile, as the majority correctly observes, citizenship in this context equates to domicile, and domicile consists of both residence in a State and an intention to remain there. Maj. Op. at 7-8. Thus, to meet this requirement, the plaintiffs must show by a preponderance of the evidence that more than two-thirds of the putative class-members both reside in Michigan and intend to remain there. But on those points (or any other) the plaintiffs have presented no evidence at all. Instead they merely cite the allegations in their complaint. That, per the law of every circuit to have addressed the issue, is reason enough to conclude that we must exercise our jurisdiction in this case.

The majority concludes otherwise by means of a presumption. As an initial matter, the guesswork here begins with even defining the putative class, since the plaintiffs neglected to define it in their putative class-action complaint. But the complaint does say that the class-members are similarly situated to the plaintiffs, and that the plaintiffs are "residents and property owners in the City of Flint" who (or which, as the case may be) were exposed to water supplied from the Flint River after April 25, 2014. Complaint ¶¶ 1, 84. Plaintiffs' counsel also clarified during oral argument that the phrase "property owners" does not modify "residents," but instead describes a separate group within the putative class. Thus, taking the allegations and clarification together, one can surmise that the class includes residents exposed to the Flint water supply after April 25, 2014, and property owners likewise exposed.

At this point the majority's presumption arises. According to the majority, the plaintiffs have alleged that the class members are residents of Flint, which (in the majority's view) creates a presumption that they are citizens as well, which in turn throws upon the *defendants* the burden of proving that one-third of the putative class are *not* citizens of Michigan. But this reasoning is mistaken both factually and legally. The factual mistake is the assertion that the plaintiffs have alleged that all the class members are Flint residents, since—per the statement of plaintiffs' counsel at oral argument—the class includes Flint "property owners" who need not be residents of Flint (or Michigan) to be members of the class. Thus, the majority's presumption of citizenship does not apply to "property owners"—whose numbers are anyone's guess. Even the

majority's presumption, therefore, does not provide us with anything near what the law would regard as a proper basis to conclude that two-thirds—as opposed to one-third, or one-half, or three-quarters—of the putative class-members are Michigan citizens. We thus lack the requisite "clearest of justifications" to decline to exercise our jurisdiction here. *Rouse*, 300 F.3d at 715.

The majority's legal mistake is more complicated. The majority observes, correctly, that "there is a *presumption* against federal jurisdiction[,]" Maj. Op. at 10, which in any particular case the party asserting jurisdiction must overcome. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Thus, the majority reasons further, the federal courts cannot presume in diversity cases—where the existence of the court's jurisdiction depends on the parties' citizenship—that a party is a citizen of a state simply because the party is a resident of it. For in that event the court would presume that jurisdiction exists, when instead the court must presume that it does not. But here the situation is different, the majority reasons, because in this case the federal courts already have jurisdiction; the question instead is whether to exercise it. The majority thus splits with five other circuits, and concludes that we are free to presume that a mere allegation of residency in Michigan is enough to prove citizenship there.

What the majority overlooks, however, is the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817. As Chief Justice Marshall put it nearly 200 years ago: "We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. 264, 404 (1821); *see also Sprint Communications, Inc. v. Jacobs*, 134 S.Ct. 584, 590-91 (2013) (same). That means we cannot presume a fact that allows us to *decline* jurisdiction, any more than we can presume a fact that allows us to find that jurisdiction exists in the first place. Thus, just as we cannot presume that residency equals citizenship when determining whether jurisdiction exists, neither can we apply that same presumption when determining whether we can decline jurisdiction. And that is exactly what the majority does here.

I would therefore dispense with all the dueling presumptions, and instead simply ask what the other circuits ask: whether the plaintiffs have produced "evidence from which the district court may make findings" that more than two-thirds of the putative class-members are

citizens of the State in which the case was originally filed.  *Mondragon*, 736 F.3d at 884.  Here, the plaintiffs have not produced such evidence, or even any evidence at all.  That conclusion, standing alone, means that we must exercise our jurisdiction in this case.

More briefly, the plaintiffs have likewise failed to show that the only Michigan defendant in this case—Lockwood, Andrews & Newnam, P.C. ("Lockwood P.C.")—is one "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class[.]" 28 U.S.C. § 1332(d)(4)(A)(II)(bb).  As an initial matter, as the Ninth Circuit has persuasively explained, the statutory reference to "alleged conduct" means that (in contrast to the citizenship requirement) we look solely to the allegations in the complaint when determining whether the plaintiffs have met this prerequisite to abstention.  *See Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010, 1015 (9th Cir. 2011).  Our inquiry as to this prerequisite is comparative:  we ask whether the in-state defendant's conduct, as alleged in the complaint, is important when compared to the conduct of the other defendants as so alleged.  *See, e.g., Westerfield v. Ind. Processing LLC*, 621 F.3d 819, 825 (8th Cir. 2010); *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009); *Evans*, 449 F.3d at 1167.

Here, the plaintiffs' allegations as to the Michigan defendant—Lockwood P.C.—are an enigma.  The complaint alleges that the City of Flint retained a Texas corporation—Lockwood, Andrews Newnam, Inc. ("Lockwood Inc."), which is likewise a defendant here—"to conduct studies and reports of a new water supply that was being developed" for the City.  Complaint ¶ 3.  The complaint also alleges that Lockwood P.C. "was incorporated in 2008 by" Lockwood Inc. after the latter was so retained, and that Lockwood Inc. "conducted business in Genesee County, Michigan through" Lockwood P.C.  The complaint then proceeds to define both Lockwood entities collectively as "LAN," which for the remainder of the complaint is the subject of every verb describing conduct allegedly forming the basis of the plaintiffs' claims.  Thus, as in a Fifth Circuit case, "nothing in the complaint distinguishes the conduct of [Lockwood P.C.] from the conduct of the other defendants."  *Opelousas Gen. Hosp. Auth. v. FairPay Sols., Inc.*, 655 F.3d 358, 362 (5th Cir. 2011).  The complaint therefore "contains no information about the conduct of [Lockwood P.C.] relative to the conduct of the other defendants[,]" and thus does not establish that Lockwood P.C's conduct "forms a significant basis of the plaintiff[s'] claims."  *Id.*

Moreover, the complaint never explains what the plaintiffs mean by their allegation that Lockwood Inc. conducted business "through" Lockwood P.C. Instead, that phrase remains an exercise in studied ambiguity. Finally, what the complaint does say about the conduct of the defendants relative to one another affirmatively suggests that the more significant actor was the remaining defendant, Leo A. Daly Company, a Nebraska corporation (which the complaint calls "LAD"). Specifically, the complaint alleges that "LAN is a subsidiary of LAD," that "LAN exists as a separate entity from LAD in name only[,]" and that "LAN is totally reliant upon LAD for direction with regard to all critical aspects of the issues giving rise to this lawsuit." Complaint ¶ 80. The complaint thus provides plenty of reason to conclude that LAD's conduct was significant as compared to either of the Lockwood entities, but no basis at all to conclude that the conduct of Lockwood P.C., in particular, was significant as compared to the conduct of the other defendants. Indeed, the district court never found that Lockwood P.C.'s alleged conduct formed a "significant basis" for the claims of the putative class. Instead, the majority supplies that finding for the first time in its opinion today.

It should take a better showing than this for a federal court to cast off its unflagging duty to exercise the jurisdiction assigned to it by Congress. I respectfully dissent.